# EXHIBIT 1

ROGELIO ARTURO ISLAS PÉREZ 04/07/25 13:33:51 706a6620636a6632000000000000000000147cb

**MEDIA DEPORTES MÉXICO, S. DE R.L. DE C.V. Y MEXICO SPORTS DISTRIBUTION, LLC.**

**VS**

**PROMOTORA DEL CLUB PACHUCA, S.A. DE C.V., TUBI, INC. Y FOX CABLE NETWORK SERVICES, LLC.**
**JUICIO: ORDINARIO MERCANTIL CON PROVIDENCIA PRECAUTORIA**
**SECRETO**

**C. JUEZ DE LO CIVIL DE PROCESO ESCRITO DE LA CIUDAD DE MÉXICO, EN TURNO.**

**ROGELIO ARTURO ISLAS PÉREZ,** promoviendo en mi carácter de apoderado general para pleitos y cobranzas de Media Deportes México, S. de R.L. de C.V., con Registro Federal de Contribuyentes MDM191007M83, que en copia simple exhibo como **Anexo 1)**; personalidad que solicito se me reconozca al tenor del testimonio notarial que exhibo como **Anexo 2)** y que previo cotejo y compulsa que del mismo se haga, pido me sea devuelto; y de Mexico Sports Distribution, LLC, una sociedad constituida conforme a las leyes de Delaware, Estados Unidos de América, y que bajo protesta de decir verdad, manifiesto que no cuenta con Registro Federal de Contribuyentes; personalidad que solicito se me reconozca al tenor del testimonio notarial que exhibo como **Anexo 3)** y que previo cotejo y compulsa que del mismo se haga, pido me sea devuelto; señalando como domicilio para oír y recibir todo tipo de notificaciones de ambas sociedades, aún las personales, la casa marcada con el número 148 de la calle de Alejandro Dumas, Colonia Polanco III Sección, alcaldía Miguel Hidalgo, C.P. 11540, en la Ciudad de México; autorizamos en términos del tercer párrafo del artículo 1069 del Código de Comercio, a los licenciados Paulo Jenaro Díez Gargari, con cédula profesional número 2357604; Carlos David Villasante Santoyo, con cédula profesional número 2613630; Mireya Martínez Gómez, con cédula profesional número 11082666; Alan Said López Ríos, con cédula profesional número 8360468; Rodrigo Bernardo Díez Gargari, con cédula profesional número 7173124 y Rodrigo Jiménez Valencia, con cédula profesional número 4490388; a quienes desde este momento facultamos para promover conjunta o separadamente en los términos que se mencionan en el precepto legal invocado, y en general, para ejercer cualquier acto procesal en interés de mi mandante; asimismo, autorizo para oír y recibir notificaciones, imponerse de los autos, fotografiar las constancias y recoger documentos y valores, firmando en lo necesario, a los señores Paulo Díez Terroba, Santiago Díez Terroba, Jesús Emmanuel Meraz Gómez, Kevin Eduardo Basilio García, Rodolfo Arturo Villa Hernández, Paola Abigail Romero Toscano, Shania Nicole

Salvador Díaz, Fátima Fabiola Ramírez Mendoza, Mitzi Alejandra Suárez Salazar, Catheryne Italia Mondragón Contreras Canchola, Rafael Castro Valles Muñoz, José Alfredo García Gómez e Ismael Olán Martínez, indistintamente; ante Usted respetuosamente expongo:

## DEMANDA

Con la personalidad que he dejado acreditada, misma que solicito se me reconozca desde luego, en representación de Media Deportes México, S. de R.L. de C.V. y de Mexico Sports Distribution, LLC, con fundamento en los artículos 1378 y siguientes del Código de Comercio, inicio juicio ordinario mercantil en contra de:

1. Promotora del Club Pachuca, S.A. de C.V., quien puede ser emplazada en la calle de Cráter número 625, Colonia Jardines del Pedregal, Alcaldía Álvaro Obregón, C.P. 01900, en la Ciudad de México;

2. Tubi, Inc., quien puede ser emplazada en 1021 West Pico Blvd., 2121/12, Los Ángeles, California 90035, en los Estados Unidos de América; y

3. Fox Cable Network Services, LLC, quien puede ser emplazada en 1021 West Pico Blvd., 2121/12, Los Ángeles, California 90035, en los Estados Unidos de América; el pago y cumplimiento de las siguientes

## PRESTACIONES

a) La declaración judicial de que Promotora del Club Pachuca, S.A. de C.V., violó el derecho de preferencia pactado en la cláusula 7 del denominado Contrato Abreviado de Compra de Programas (Short Form Program Purchase Agreement) de 27 de mayo de 2014, y su modificación de fecha 4 de octubre de 2017, por los actos ilícitos que se describirán en los hechos de esta demanda.

b) La indemnización a Media Deportes México, S. de R.L. de C.V. y a Mexico Sports Distribution, LLC, por los daños y perjuicios que sufrieron como consecuencia directa e inmediata de la conducta ilícita de Promotora del Club Pachuca, S.A. de C.V., al celebrar un contrato con un tercero, ajeno a mis representadas (Fox Cable

2

Network Services, LLC), cuyo objeto es esencialmente igual al del Contrato Abreviado de Compra de Programas de 27 de mayo de 2014, y su modificación de fecha 4 de octubre de 2017, sin respetar el derecho de preferencia pactado en la cláusula 7 de dicho acuerdo de voluntades; merma patrimonial y lucro cesante que se cuantificarán en ejecución de sentencia, de conformidad con lo dispuesto por el artículo 1348 del Código de Comercio.

c) La condena a Tubi Inc. y a Fox Cable Network Services, LLC, para que respeten el derecho de preferencia pactado en la cláusula 7 del Contrato Abreviado de Compra de Programas de 27 de mayo de 2014, y su modificación de fecha 4 de octubre de 2017 celebrado entre Mexico Sports Distribution, LLC, y Promotora del Club Pachuca, S.A. de C.V.

d) La nulidad de la cláusula 3 del Contrato Abreviado de Compra de Programas de 27 de mayo de 2014, y su modificación de fecha 4 de octubre de 2017 celebrado entre Mexico Sports Distribution, LLC, y Promotora del Club Pachuca, S.A. de C.V.; titulada "Ley Aplicable; Jurisdicción", por contravenir lo dispuesto en el artículo 1093 del Código de Comercio y la jurisprudencia *"COMPETENCIA POR TERRITORIO EN MATERIA MERCANTIL. SU PRÓRROGA POR PACTO DE SUMISIÓN EXPRESA ESTÁ LIMITADA A LOS CASOS PREVISTOS EN EL ARTÍCULO 1093 DEL CÓDIGO DE COMERCIO",* que se invoca en esta demanda.

e) El pago de los gastos y costas que se generen por la tramitación de este juicio.

Antes de entrar al sustento fáctico de la demanda, conviene a mis poderdantes hacer valer las siguientes

## CONSIDERACIONES PRELIMINARES

Mis poderdantes Media Deportes México, S. de R.L. de C.V. (en adelante **"MDM"**) y Mexico Sports Distribution, LLC (en lo sucesivo **"FSM"**) son personas morales subsidiarias de Grupo Lauman Holding, S. de R.L. de C.V. (en adelante **"Grupo Lauman Holding"**) que operan el negocio conocido como *Fox Sports México*[1].

---

[1] A lo largo del presente escrito, el término *"Fox Sports México"* debe ser entendido como una referencia conjunta a FSM y a MDM.

3

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a6f620636a66320000000000000000000147cb

El negocio de Fox Sports México consiste principalmente en transmitir eventos deportivos a través de canales de televisión restringida (es decir, de paga). Toda vez que dichos eventos son sintonizados por un gran número de personas, diversos anunciantes están interesados en contratar tiempos y espacios para transmitir mensajes comerciales en los canales de Fox Sports México.  El negocio de Fox Sports México está integrado, principalmente, por los siguientes tipos de contratos:

- Contratos de licencia de derechos para la transmisión de eventos deportivos: Fox Sports México paga a los titulares y/o dueños de los derechos para la transmisión de eventos deportivos (por ejemplo, equipos de fútbol soccer, la NFL, la Fórmula 1, etc.) como contraprestación por el otorgamiento de una licencia para transmitir dichos eventos deportivos. **FSM celebró un contrato de esta naturaleza con la hoy demandada, Promotora del Club Pachuca, S.A. de C.V.**

- Contratos de distribución o afiliación: los proveedores de servicio de televisión y audio restringidos (es decir, proveedores de televisión de paga, que, en México incluyen, entre otros, a Sky, Totalplay e Izzi) pagan a Fox Sports México una cantidad fija por cada suscriptor al servicio correspondiente.

- Contratos de publicidad: Fox Sports México vende a terceros tiempos y espacios para mensajes comerciales transmitidos en sus canales. **MDM celebra contratos de esta naturaleza y los celebró mientras el grupo controlador de mis mandantes transmitió los partidos de futbol soccer del equipo varonil Club de Futbol Pachuca (en adelante, "Pachuca Varonil") como local.**

- Contratos de talentos: contratos celebrados por Fox Sports México con comentaristas y analistas que agregan valor a su programación.

Desde este momento, es relevante hacer una distinción conceptual que resulta fundamental para la adecuada comprensión de esta demanda. El negocio de Fox Sports México fue originalmente —antes del año 2019— propiedad de Twenty-First Century Fox, Inc. (en lo sucesivo **"21CF"**),

una sociedad constituida de conformidad con las leyes de Delaware, Estados Unidos de América. 21CF era una corporación multinacional de medios de comunicación controlada por la familia Murdoch, que llegó a ser el cuarto mayor conglomerado de medios de comunicación de los Estados Unidos de América.

En el año 2018, la mayoría de los activos de 21CF se vendió a The Walt Disney Company (en adelante **"Disney"**). Los activos restantes, no incluidos en la venta a Disney, permanecieron bajo el control de una nueva sociedad, también controlada por la familia Murdoch, cuya denominación es Fox Corporation (en adelante **"Fox Corp."**). Entre los activos originalmente transferidos a Disney, se encontraban los correspondientes al negocio de Fox Sports México.

En México, la compraventa de activos celebrada entre Disney y 21CF quedó sujeta a la autorización, entre otros, del Instituto Federal de Telecomunicaciones (en lo sucesivo, el **"IFT"**). Antes de la adquisición del negocio de 21CF, Disney ya tenía una participación relevante en el mercado de transmisión de eventos deportivos en la televisión de paga, a través del negocio conocido como ESPN. Por ello, para impedir una concentración de carácter monopólico, el IFT autorizó la compra de activos de Disney a 21CF, pero sujeto a la condición de que el negocio de Fox Sports México fuera desincorporado de la operación, es decir, que fuera vendido por Disney a un tercero independiente.

Como resultado de ese proceso de desincorporación, el 10 de noviembre de 2021, Grupo Lauman Holding adquirió el negocio de Fox Sports México de Disney, mediante la compra de las acciones de las hoy actoras: MDM y FSM. Por ello, desde el 10 de noviembre de 2021, el negocio de Fox Sports México es propiedad de Grupo Lauman Holding, a través de las hoy actoras, MDM y FSM.

Así, el negocio de Fox Sports México ha operado ininterrumpidamente en el país desde el año 1999 hasta la fecha, bajo el control de distintos grupos empresariales:

- Antes del año 2019, el negocio de Fox Sports México operó bajo el control de 21CF, controlada, a su vez, por la familia Murdoch.

- Entre el año 2019 y el 2021, el negocio de Fox Sports México operó bajo el control de Disney.

- A partir del año 2021, el negocio de Fox Sports México opera (hasta la fecha) bajo el control de Grupo Lauman Holding.

Para efectos de la presente demanda, es importante tener presente la distinción entre dos entidades con nombres similares, pero que son totalmente independientes entre sí desde el punto de vista corporativo:

- Por un lado, **Fox Corp.**, una sociedad constituida de conformidad con la legislación del estado de Delaware, Estados Unidos de América, que cotiza en la bolsa de valores de Nueva York bajo la clave de pizarra "FOX", y que es actualmente una de las más grandes corporaciones multinacionales con participación en el sector de los medios de comunicación;

- Por el otro lado, **Fox Sports México**, un negocio propiedad (indirectamente) de Grupo Lauman Holding, a través de las hoy actoras MDM y FSM, titular o licenciatario de los derechos para transmitir diversos eventos deportivos a través de la televisión de paga en territorio nacional.

Desde la época en que el negocio de Fox Sports México estaba bajo el control de 21CF (hoy Fox Corp.), la programación de Fox Sports México incluía la transmisión de los partidos de varios equipos de la primera división del futbol mexicano (Liga MX), entre los que destacan los partidos del Pachuca Varonil. Originalmente, cuando el negocio estuvo bajo el control de 21CF, los derechos de transmisión de estos equipos habían sido licenciados en favor de FSLA Holding, LLC (en adelante **"FSLA"**), una subsidiaria de 21CF. Cuando el negocio fue adquirido por Grupo Lauman Holding, los derechos de transmisión referidos fueron cedidos en favor de la hoy actora, FSM.

Ahora bien, y en esto radica el punto toral de esta demanda: toda vez que los contratos de licencia de derechos de transmisión constituyen uno de los pilares del negocio de Fox Sports México, en muchos casos los mismos incluyen cláusulas que la protegen para efecto de darle preferencia frente a cualquier tercero para celebrar nuevos contratos una vez que los actualmente vigentes terminen. En términos generales, dichas cláusulas facultan a Fox Sports México para igualar cualquier oferta realizada por un tercero para celebrar nuevos contratos una vez que haya transcurrido la vigencia de los contratos actuales.

6

Como ya ha sido narrado en esta consideración preliminar, desde el año 2019, Fox Corp., dejó de tener participación alguna en el mercado de transmisión de eventos deportivos en el territorio de México. Sin embargo, recientemente Fox Corp., ha mostrado interés en volver a participar activamente en dicho mercado. Para efectos de lograr lo anterior, Fox Corp., ha empezado negociaciones con diversos titulares de derechos de transmisión de eventos deportivos con el objeto de que le sean otorgadas las licencias para llevar a cabo dichas transmisiones en territorio nacional. Aunque no es objeto de la presente demanda, desde este punto es necesario destacar que, como parte de su estrategia para reincorporarse al mercado de transmisión de eventos deportivos en México, Fox Corp., ha dañado ilícitamente a mis representadas (tanto en su situación patrimonial como reputacional), con la finalidad de que éstas pierdan algunos de sus activos más valiosos, que, una vez perdidos por mis representadas, podrían ser adquiridos por Fox Corp. La estrategia de Fox Corp., ha sido ejecutada, entre otras cosas, mediante una falsa manifestación de interés en adquirir la totalidad del negocio de Fox Sports México de mis representadas, con la que Fox Corp. logró obtener una posición privilegiada de acceso a la administración de mis representadas. Valiéndose de dicha posición privilegiada, Fox Corp., deliberada e ilícitamente llevó a cabo una serie de conductas con el objeto de perjudicar financiera, comercial y reputacionalmente a mis representadas, y beneficiarse de dicho perjuicio (adquiriendo algunos o todos los activos perdidos por mis representadas como consecuencia de la conducta ilícita de Fox Corp.). Desde este momento, mis representadas se reservan expresamente su derecho y acción para reclamar de Fox Corp., y/o de cualquiera de sus subsidiarias, filiales y/o partes relacionadas la indemnización por los daños y perjuicios ocasionados por las conductas a las que de manera general se hace referencia en este párrafo, y que son distintas a las reclamadas en la presente demanda.

Según se narrará en los hechos de esta demanda, recientemente Fox Corp. —a través de alguna de sus subsidiarias y/o filiales—, celebró contratos con el grupo controlador de Pachuca y/o con Pachuca para transmitir **en territorio mexicano** (entre otros) los partidos que dicho equipo juegue como local. Y, en efecto, como demostraremos en este juicio, Fox Corp., ha empezado a transmitir dichos partidos a través de su plataforma Tubi —controlada por Fox Corp., a través de su subsidiaria Tubi, Inc., una sociedad constituida de conformidad con la legislación del estado de Delaware, Estados Unidos de América (en lo sucesivo **"Tubi"**)—. El problema con ello es que el grupo controlador de Pachuca celebró los contratos con Fox Corp. – a través de la hoy codemandada Fox Cable Networks, LLC (en adelante **"Fox Cable"**) en franca

7

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a6620656a6632000000000000000000000147cb

violación del derecho de preferencia otorgado en favor de la hoy coactora FSM, con lo cual, la hoy demandada ha causado —y, en caso de no impedírselo, seguirá causando— graves daños y perjuicios a mis representadas, mismos que se describirán en este escrito y que incluyen, sin limitar, todas las cantidades por concepto de pautas publicitarias que MDM dejó de ganar y que, en cambio, fueron (y siguen siendo) obtenidas ilícitamente por un tercero ajeno a mis mandantes.

Expuesto lo anterior, a continuación, narro los hechos y consideraciones de derecho en que se sustenta la presente demanda:

## HECHOS

**1.-**     El 27 de mayo de 2014, la hoy demandada Promotora del Club Pachuca, S.A. de C.V. (en adelante **"Pachuca"**) y FSLA —entonces una subsidiaria de 21CF— celebraron un Contrato de Compraventa de Derechos de Programación (Short Form Program Purchase Agreement) (en lo sucesivo simplemente el **"Contrato Pachuca"**) que tenía por objeto otorgar a FSLA el derecho exclusivo a transmitir a nivel mundial (con excepción de los Estados Unidos de América) todos los partidos en los que el Pachuca Varonil jugara como local.

Originalmente, el Contrato Pachuca estaría vigente hasta el posterior de los siguientes eventos: (i) el último partido del Torneo Clausura 2019; y (ii) el 30 de junio de 2019.

Bajo protesta de decir verdad, manifiesto que mis representadas no cuentan con este documento en original o en copia certificada, en tanto que nunca les fue entregado por FSLA; por lo cual, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, solicito a su Señoría requiera a Pachuca para que al momento de dar contestación a la demanda, exhiba el mismo en original o en copia certificada; con el apercibimiento que de no hacerlo, se tendrán por ciertas las afirmaciones de mis representadas vertidas en esta demanda. Sin perjuicio de lo anterior, se exhibe copia del Contrato Pachuca, con su respectiva traducción al español por perito autorizado de ese H. Tribunal, como **Anexo 4)**.

**2.-**     Por virtud del Contrato Pachuca, la hoy demandada otorgó, entre otras cosas, una licencia exclusiva en favor de FSLA (este último, en su carácter de licenciatario, a quien en el Contrato Pachuca se hace referencia

8

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6f620636a6632000000000000000000000000147cb

como "Fox") para transmitir en todo el mundo, excepto en los Estados Unidos de América, todos los partidos que el Pachuca Varonil jugara como local durante la vigencia del Contrato Pachuca:

| | |
|---|---|
| Evento(s): | Los juegos locales de temporada, amistosos, de temporada regular y playoff (liguilla) del Club de Futbol Pachuca ("Pachuca") en cualquier lugar en el que Pachuca este designado como el anfitrión o "equipo local", durante la vigencia; o k o cualquier juego cuyos derechos de vídeo/TV sean controlados por la propietaria, incluyendo, entre otros, cualquier "equipo local" hola juegos controlados por la propietaria de:<br>    a) Liga MX- Torneos Apertura y Clausura: todos y cada uno, pero un mínimo de 17 juegos, más cualquier juego de playoffs (Liguilla) y juegos de la final;<br>    b) Copa MX- todos y cada uno de los juegos y/o a finales; y<br>    c) Amistosos- todos los juegos, copas y/o torneos (cuadrangulares) |
| Territorio: | el territorio será todo el mundo, en el entendido, sin embargo, que Fox no tiene derechos para exhibir o utilizar los Eventos en los Estados Unidos de América, incluyendo Puerto Rico (excepto por los derechos de acceso a noticias y sucesos sobresalientes). |
| Idioma(s): | Los Eventos podrán exhibirse por Fox en todos y cada uno de los idiomas. |

**3.-**   Como parte del objeto del Contrato Pachuca, está el derecho del licenciatario —originalmente, FSLA, y hoy mi mandante FSM— de publicitar, comercializar, promover, exhibir, otorgar en sublicencia y distribuir en exclusiva los juegos del Pachuca antes mencionados:

| | |
|---|---|
| Base de transmisión: | Fox tendrá derecho a publicitar, comercializar, promover, exhibir, otorgar en sublicencia y distribuir los Eventos, ya sea en vivo o de manera diferida, en los idiomas, en todo el Territorio, durante la Vigencia, mediante todos y cada uno de los medios de comunicación, tecnologías o medios de transmisión, de audio y visuales conocidos actualmente o que se desarrolle en el futuro (incluyendo, entre otros, Video On Demand, Pay Per View, 3D, medios digitales o tecnologías interactivas, incluyendo, entre otros, móviles, internet, banda ancha, consolas de juego, tabletas, etc.) Ya sean digitales, análogas, de alta definición o modificados conforme a los términos y condiciones contenidos en el presente Contrato. |
| Exclusividad: | Los derechos otorgados a Fox en el presente son exclusivos en los Idiomas en todo el Territorio a través de la Base de Transmisión; en el entendido, sin embargo, que: |

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a662b636a66320000000000000000000147cb

1. Fox reconoce y conviene que Claro Sports o cualquier otro canal de deportes propiedad de América Móvil podrá exhibir, de manera no exclusiva, una transmisión simultánea en vivo de los Eventos de larga duración de la Liga MX que exhiba Fox, en el entendido que los Eventos de la Liga MX únicamente podrán exhibirse en la plataforma de Televisión de paga DISH a través de DBS (satélite), únicamente en el idioma español en México;

2. La Propietaria tendrá derecho a poner los Eventos de la Liga MX a disposición sobre una base no exclusiva, a través de las plataformas de internet América Móvil (p. ej., UNOtv o clarosports.com) o cualquier otro servicio de distribución digital/móvil propiedad de América Móvil en toda Latinoamérica;

3. La Propietaria se asegurará que los Eventos otorgados en licencia por la Propietaria de acuerdo con las Secciones 1 y 2 anteriores empleen tecnología de geobloqueo estándar de la industria en forma tal que restrinja el excedente de las exhibiciones de los eventos fuera de sus respectivos territorios y prohíba el acceso a los Eventos de manera gratuita (es decir, todas las exhibiciones digitales se seguirán haciendo conforme a un muro de pago); y

4. La Propietaria Debe asegurarse que ninguna exhibición en los EE.UU. sea accesible a espectadores en el Territorio, excepto por los excedentes limitados e incidentales provocados por una señal de transmisión terrestre.

Vigencia/Ciclos:    Los derechos de Fox en el presente iniciarán cuando ocurra lo primero entre el 1° de julio de 2014 o el inicio del Torneo Apertura 2014 y vencerán cuando suceda lo último entre el 30 de junio de 2019 o el juego final del Torneo Clausura 2019. Fox tendrá permitido ciclos o exhibiciones ilimitadas de los Eventos durante la Vigencia. No obstante la Vigencia, Fox tendrá 1 año después del vencimiento de la Vigencia para utilizar o exhibir los Eventos que se realizaron durante la Vigencia.

**4.-**    Las partes pactaron que el Contrato Pachuca tendría una vigencia desde el 1° de julio de 2014 y hasta la posterior de las siguientes fechas: el 30 de junio de 2019 o bien, el juego final del Torneo Clausura 2019[2].

Esta vigencia se amplió con motivo de su convenio modificatorio de fecha 4 de octubre de 2017 (en adelante el **"Convenio Modificatorio"**), para ampliarlo cuando menos hasta el 30 de junio de 2024 o el último partido del Torneo Clausura 2024, lo último que ocurriera.

---

[2] El segundo partido de la final del Torneo Clausura 2019 se jugó entre León y Tigres el 26 de mayo de 2019. https://es.wikipedia.org/wiki/Torneo_Clausura_2019_(M%C3%A9xico)

Bajo protesta de decir verdad, manifiesto que mis representadas no cuentan con este documento en original o en copia certificada, en tanto que nunca les fue entregado por FSLA; por lo cual, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, solicito a su Señoría requiera a Pachuca para que al momento de dar contestación a la demanda, exhiba el mismo en original o en copia certificada; con el apercibimiento que de no hacerlo, se tendrán por ciertas las afirmaciones de mis representadas vertidas en esta demanda. Sin perjuicio de lo anterior, se exhibe copia del Convenio Modificatorio, con su respectiva traducción al español por perito autorizado de ese H. Tribunal, como **Anexo 5)**.

**5.-** Como contraprestación por los derechos exclusivos de transmisión objeto del Contrato Pachuca, Pachuca tuvo derecho a percibir las cantidades que enseguida se relacionan, bajo el calendario previsto en el propio Contrato Pachuca:

| | |
|---|---|
| Cuota Total de Licencia: | Sujeto a los términos del presente, Fox deberá pagar a la Propietaria los montos que se detallan a continuación (conjuntamente, la "Cuota de Licencia") como se indica: |
| | Temporada 2014/15 (Apertura/Clausura): un total de USD $8,000,000.00 (OCHO MILLONES DE DÓLARES ESTADUNIDENSES). |
| | Además, Fox conviene pagar a la Propietaria los siguientes montos por cada una de las rondas de Liguilla (playoff) en las que participe el Pachuca: |
| | Cuartos de Final: USD $700,000.00 |
| | Semifinales: USD $650,000.00 |
| | Final: USD $650,000.00 |
| | |
| | Temporada 2015/16 (Apertura/Clausura): un total de USD $8,250,000.00 (OCHO MILLONES DOSCIENTOS CINCUENTA MIL DÓLARES ESTADUNIDENSES). |
| | Además, Fox conviene pagar a la Propietaria los siguientes montos por cada una de las rondas de Liguilla (playoff) en las que participe el Pachuca: |
| | Cuartos de Final: USD $700,000.00 |
| | Semifinales: USD $650,000.00 |
| | Final: USD $650,000.00 |
| | |
| | Temporada 2016/17 (Apertura/Clausura): un total de USD $8,500,000.00 (OCHO MILLONES QUINIENTOS MIL DÓLARES ESTADUNIDENSES). |
| | Además, Fox conviene pagar a la Propietaria los siguientes montos por cada una de las rondas de Liguilla (playoff) en las que participe el Pachuca: |
| | Cuartos de Final: USD $700,000.00 |
| | Semifinales: USD $650,000.00 |
| | Final: USD $650,000.00 |
| | |
| | Temporada 2017/18 (Apertura/Clausura): un total de USD $8,750,000.00 (OCHO MILLONES SETECIENTOS CINCUENTA MIL DÓLARES ESTADUNIDENSES). |

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a6620636a6632000000000000000000147cb

Además, Fox conviene pagar a la Propietaria los siguientes montos por cada una de las rondas de Liguilla (playoff) en las que participe el Pachuca:
Cuartos de Final: USD $700,000.00
Semifinales: USD $650,000.00
Final: USD $650,000.00

Temporada 2018/19 (Apertura/Clausura): un total de USD $9,000,000.00 (NUEVE MILLONES DE DÓLARES ESTADUNIDENSES).
Además, Fox conviene pagar a la Propietaria los siguientes montos por cada una de las rondas de Liguilla (playoff) en las que participe el Pachuca:
Cuartos de Final: USD $700,000.00
Semifinales: USD $650,000.00
Final: USD $650,000.00

Con el fin de evitar toda duda, los honorarios responsabilidad de Fox se pagarán menos todos y cada uno de los impuestos aplicables, incluyendo, con el fin de evitar toda duda, cualquier IVA o VAT, de acuerdo con el Calendario de Pagos que se detalla a continuación.

| | |
|---|---|
| Calendario de Pagos: | Fox deberá pagar a la Propietaria la Cuota Total de Licencia como se indica a continuación: |

a) 50% de la Cuota de Licencia anual aplicable el 15 de junio de cada año durante la Vigencia, en el entendido que el primer pago de la Vigencia se realizará dentro de los 30 días posteriores a la firma del presente;

b) 50% de la Cuota de Licencia anual aplicable el 15 de enero de cada año durante la Vigencia; y

c) Si el Pachuca llega a participar en la Liguilla, 100% de cada ronda correspondiente dentro de los 30 días a partir de la ronda respectiva.

No obstante lo anterior, todos y cada uno de los pagos que se adeuden conforme al presente documento se pagara cuando suceda lo último entre: (i) las fechas anteriores; (ii) la celebración del presente Contrato por ambas partes; y (iii) dentro de los 60 días posteriores a la fecha en que Fox reciba una factura original de la Propietaria.

**6.-** En la cláusula 7 del Contrato Pachuca, se estableció un "derecho de preferencia en la negociación" en favor del licenciatario; que, en el momento de la celebración del Contrato Pachuca fue FSLA y hoy es mi mandante FSM.

De conformidad con lo establecido en el contrato referido, durante los 60 (sesenta) días previos a la terminación del mismo, Pachuca y el licenciatario debían negociar de buena fe una prórroga en la vigencia del contrato, para la transmisión de las temporadas siguientes. En caso de que Pachuca y el licenciatario no pudieran llegar a un acuerdo durante el plazo de

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51
706a6620636a6632000000000000000000000147cb

60 (sesenta días), Pachuca podría negociar libremente con cualquier tercero la celebración de un nuevo contrato que tuviera por objeto transmitir los partidos que el Pachuca Varonil jugara como local:

**7.-** En esa misma cláusula, las partes pactaron un derecho de preferencia en favor del licenciatario. De conformidad con lo establecido en el Contrato Pachuca, el licenciatario tendría derecho a igualar cualquier oferta hecha por cualquier tercero, dentro de los 10 (diez) días siguientes a la fecha en que el licenciatario hubiera recibido de Pachuca una copia de la oferta realizada por el tercero correspondiente.

**8.-** Por vía de consecuencia, y en términos de lo pactado y aceptado por las partes en la cláusula 7 del Contrato Pachuca, Pachuca **no podía** aceptar ninguna oferta hecha por un tercero (es decir, Pachuca tenía **prohibido** celebrar un nuevo contrato con un tercero cuyo objeto fuera la transmisión de los partidos que el Pachuca Varonil jugara como local), sin antes haberle permitido al licenciatario -hoy FSM- ejercer su derecho de preferencia.

**9.-** El 31 de octubre de 2021, FSLA —cuya denominación, para ese entonces, había cambiado a TFCF Holding LLC)— cedió el Contrato Pachuca en favor de mi poderdante FSM.

Lo anterior se acredita con un ejemplar con firmas electrónicas del contrato de cesión respectivo, que se exhibe como **Anexo 6)** y su respectiva traducción al español; y al respecto, en la cláusula 8 de esta cesión, las partes estipularon que *"El presente Acuerdo podrá ser celebrado y las firmas intercambiadas por medios electrónicos en cualquier número de ejemplares, cada uno de los cuales constituirá un original…"*

**10.-** El 10 de noviembre de 2021, las acciones representativas de la totalidad del capital social de FSM fueron adquiridas por distintas subsidiarias de Grupo Lauman Holding. La cesión y cambio de control referidos fueron notificados por FSM a Pachuca el 30 de noviembre de 2021, tal y como se desprende de la misiva de esa misma fecha y su respectiva traducción, entregada a Pachuca vía correo electrónico y que se exhiben como **Anexo 7)**.

Como consecuencia de lo anterior, a partir de esa fecha, FSM adquirió el carácter de licenciatario en el Contrato Pachuca, y todas las referencias a FSLA en el mismo debían entenderse como referencias a FSM.

13

**11.-** Más allá de que la cesión referida en el hecho anterior fue oportunamente notificada a Pachuca, la misma fue consentida por ésta, pues por lo menos a partir del mes de enero de 2022, emitió las facturas correspondientes a nombre de FSM, y no de FSLA; amén de que Pachuca recibió las cantidades ahí consignadas de FSM y no de FSLA.

Lo anterior se acredita con ciertas facturas emitidas por Pachuca a FSM durante los años 2022, 2023 y 2024, en relación con la contraprestación por los derechos exclusivos de transmisión objeto del Contrato Pachuca, y que se describen más adelante; mismas que impresas y almacenadas en formatos XML y PDF en un medio USB[3], se exhiben conjuntamente como **Anexo 8)** de esta demanda; y que constituyen prueba plena de la relación jurídica y comercial entre las partes, al tenor de los artículos 29 y 29-A del Código Fiscal de la Federación y 210-A del Código Federal de Procedimientos Civiles, de aplicación supletoria[4].

**12.-** Como se ha visto, de conformidad con lo aceptado por las partes en el Contrato Pachuca, para que Pachuca pudiera otorgarle a cualquier tercero distinto a FSM los derechos para transmitir los partidos de local del Pachuca Varonil tras la terminación de la vigencia del Contrato Pachuca, tendrían que haberse cumplido los siguientes requisitos esenciales; a saber:

   a) Con por lo menos 60 (sesenta) días de anticipación a la terminación de la vigencia, Pachuca y FSM debían haber iniciado una negociación de buena fe para prorrogar la vigencia del Contrato Pachuca Varonil;

   b) En caso de no llegar a un acuerdo durante los 60 (sesenta) días previstos en el propio contrato, Pachuca tendría la obligación de notificar a FSM cualquier oferta suscrita por un tercero para adquirir la licencia para transmitir los partidos que el Pachuca Varonil jugara como local en temporadas de la Liga MX posteriores a aquellas durante las cuales estuvo vigente el Contrato Pachuca , para efecto de que FSM pudiera ejercer su

---

[3] Por sus siglas en inglés **U**niversal **S**eries **B**us.
[4] "FACTURAS. LA INFORMACIÓN GENERADA O COMUNICADA QUE CONSTE EN MEDIOS ELECTRÓNICOS, ÓPTICOS O EN CUALQUIER OTRA TECNOLOGÍA, OBTENIDA A TRAVÉS DEL CÓDIGO QR QUE AQUÉLLAS CONTIENEN, SE RECONOCE COMO PRUEBA PLENA." Registro digital: 2024497. Instancia: Tribunales Colegiados de Circuito. Undécima Época. Materias(s): Civil. Tesis: I.3o.C.467 C (10a.) Fuente: Gaceta del Semanario Judicial de la Federación. Libro 12, Abril de 2022, Tomo IV, página 2726. Tipo: Aislada

derecho de preferencia dentro de los 10 (diez) días siguiente a haber recibido la notificación respectiva.

Cualquier nuevo contrato celebrado por Pachuca sin haber cumplido previamente con los requisitos anteriores, sería violatorio de los derechos de FSM al amparo del Contrato Pachuca, y ocasionaría daños y perjuicios significativos a FSM. Adicionalmente, causaría daños y perjuicios significativos a MDM, quien no podría comercializar los partidos del Pachuca Varonil a través del cobro de pautas publicitarias.

**13.-**    El último partido del Torneo Clausura 2024 se jugó el 26 de mayo de 2024, entre el Club América y el Club de Futbol Cruz Azul[5]. Por lo tanto, de conformidad con lo pactado en el Contrato Pachuca, su vigencia terminaría en la fecha posterior de las siguientes: (i) el último partido del Torneo Clausura 2024; y (ii) el 30 de junio de 2024. Toda vez que el 30 de junio de 2024 es posterior, se trata de la fecha en que terminó la vigencia del Contrato Pachuca.

**14.-**    Mientras fungió como licenciatario del Contrato Pachuca - es decir, y cuando menos desde 2022 a 2024- Pachuca emitió a FSM por lo menos las siguientes facturas:

| FECHA DE EXPEDICIÓN | MONTO (DÓLARES) |
|---|---|
| 03-01-2022 | $4'875,000.00 |
| 02-05-2022 | $700,000.00 |
| 16-05-2022 | $650,000.00 |
| 23-05-2022 | $650,000.00 |
| 01-06-2022 | $5'000.000.00 |
| 03-10-2022 | $700,000.00 |
| 17-10-2022 | $650,000.00 |
| 24-10-2022 | $650,000.00 |
| 16-02-2023 | $1'000,000.00 |
| 03-04-2023 | $500,000.00 |
| 12-05-2023 | $800,000.00 |
| 12-06-2023 | $500,000.00 |
| 04-08-2023 | $200,000.00 |
| 14-08-2023 | $175,000.00 |
| 21-08-2023 | $175,000.00 |
| 01-09-2023 | $850,000.00 |
| 06-10-2023 | $800,000.00 |
| 06-10-2023 | $250,000.00 |

---

[5] https://es.wikipedia.org/wiki/Torneo_Clausura_2024_(M%C3%A9xico

15

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a6620636a6632000000000000000000147cb

| 29-12-2023 | $1'000,000.00 |
|---|---|
| 22-01-2024 | $1'750,000.00 |
| 05-03-2024 | $500,000.00 |
| 11-03-2024 | $300,000.00 |
| 19-03-2024 | $250,000.00 |
| 28-03-2024 | $500,000.00 |
| 16-04-2024 | $100,000.00 |
| 16-04-2024 | $325,000.00 |
| 16-04-2024 | $500,000.00 |
| 20-05-2024 | $500,000.00 |
| 31-05-2024 | $300,000.00 |
| 20-06-2024 | $1'000,000.00 |

| FECHA DE EXPEDICION | MONTO (PESOS MEXICANOS) |
|---|---|
| 2022-01-03 | $4'349,121.88 |
| 2022-07-06 | $5'095,425.00 |

Y FSM pagó a Pachuca a su cuenta en pesos en Banco Mercantil del Norte, S.A., al menos, las cantidades siguientes:

| Fecha de expedición | Cuenta bancaria | Monto (dólares americanos) |
|---|---|---|
| 22-01-2024 | 072290001799964870 | $1'750,000.00 |
| 01-03-2024 | 072290001799964870 | $500,000.00 |
| 08-03-2024 | 072290001799964870 | $300,000.00 |
| 15-03-2024 | 072290001799964870 | $250,000.00 |
| 27-03-2024 | 072290001799964870 | $500,000.00 |
| 15-04-2024 | 072290001799964870 | $500,000.00 |
| 15-04-2024 | 072290001799964870 | $325,000.00 |
| 15-04-2024 | 072290001799964870 | $100,000.00 |
| 17-05-2024 | 072290001799964870 | $500,000.00 |
| 31-05-2024 | 072290001799964870 | $300,000.00 |
| 20-06-2024 | 072290001799964870 | $1'000,000.00 |
| 03-08-24 | 072290001799964870 | $300,000.00 |

Lo anterior se acredita con un medio de almacenamiento electrónico USB que contiene estas facturas en formatos PDF y XML e

16

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a6620636a6632000000000000000000147cb

impresiones, **Anexo 8)**; más impresiones de los comprobantes de pago a Pachuca que se exhiben como **Anexo 9)**.

**15.-**    Asimismo, mientras fungió como licenciatario del Contrato Pachuca, FSM transmitió por lo menos los siguientes partidos del Pachuca Varonil a través de la señal de Fox Sports México:

| Partido | Fecha |
|---|---|
| Pachuca vs San Luis | 14/5/2022 |
| Pachuca vs América | 22/5/2022 |
| Pachuca vs Atlas | 29/5/2022 |
| Pachuca vs Querétaro | 4/7/2022 |
| Pachuca vs Mazatlán | 18/7/2022 |
| Pachuca vs Pumas | 24/7/2022 |
| Pachuca vs Tigres | 7/8/2022 |
| Pachuca vs América | 17/8/2022 |
| Pachuca vs León | 21/8/2022 |
| Pachuca vs Atlas | 25/8/2022 |
| Pachuca vs Santos | 3/9/2022 |
| Pachuca vs Tijuana | 11/9/2022 |
| Pachuca vs Tigres | 16/10/2022 |
| Pachuca vs Monterrey | 20/10/2022 |
| Pachuca vs Toluca | 30/10/2022 |
| Pachuca vs Puebla | 9/01/2023 |
| Pachuca vs Juárez | 22/1/2023 |
| Pachuca vs Necaxa | 22/1/2023 |
| Pachuca vs Guadalajara | 11/2/2023 |
| Pachuca vs Toluca | 19/2/2023 |
| Pachuca vs Monterrey | 12/3/2023 |
| Pachuca vs Cruz Azul | 1/4/2023 |
| Pachuca vs San Luis | 22/4/2023 |
| Pachuca vs Santos | 6/5/2023 |
| Pachuca vs Pumas | 16/7/2023 |
| Pachuca vs Cruz Azul | 23/8/2023 |
| Pachuca vs San Luis | 28/8/2023 |
| Pachuca vs Santos | 18/9/2023 |
| Pachuca vs Necaxa | 30/9/2023 |
| Pachuca vs Tigres | 7/10/2023 |
| Pachuca vs Puebla | 28/10/2023 |
| Pachuca vs Monterrey | 4/11/2023 |
| Pachuca vs Atlas | 31/1/2024 |
| Pachuca vs Tijuana | 3/2/2024 |

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6620656a6632000000000000000000000147cb

| Pachuca vs León | 7/2/2024 |
| Pachuca vs América | 17/2/2024 |
| Pachuca vs Juárez | 2/3/2024 |
| Pachuca vs Querétaro | 9/3/2024 |
| Pachuca vs Toluca | 30/3/2024 |
| Pachuca vs Guadalajara | 13/4/2024 |
| Pachuca vs Mazatlán | 27/4/2024 |
| Pachuca vs Pumas | 2/5/2024 |
| Pachuca vs Necaxa | 5/5/2024 |
| Pachuca vs América | 8/5/2024 |

Lo anterior se acredita con el instrumento público número 139,540 de 11 de febrero de 2025, otorgado ante la fe del licenciado Alfonso Zermeño Infante, Notario Público número 5 de la Ciudad de México; que se exhibe como **Anexo 10)**.

**16.-**    Dentro del negocio de Fox Sports México, la sociedad que regularmente obtiene las licencias para transmitir eventos deportivos es FSM, mientras que la sociedad que de manera regular se encarga de la comercialización de espacios publicitarios en los canales de Fox Sports México es MDM. En ese sentido, la sociedad que obtiene ingresos por la transmisión de anuncios durante los eventos deportivos que FSM tiene derecho a transmitir, es MDM. En muchos casos, MDM obtiene dichos ingresos por colocar discrecionalmente publicidad que le es encomendada por un tercero (por ejemplo, TV Azteca, con quien contratan directamente las agencias publicitarias). El precio que los terceros están dispuestos a pagar es una función directa de los eventos deportivos transmitidos. Por ejemplo, durante el año 2023 —año en el que el Contrato Pachuca permanecía vigente y FSM era el licenciatario de los derechos de transmisión del Pachuca Varonil— MDM obtuvo ingresos derivados de venta de espacios publicitarios en los canales de Fox Sports México a TV Azteca por aproximadamente las siguientes cantidades:

| Fecha expedición | Monto (M.N.) |
|---|---|
| 16-02-2023 | $6'464,071.78 |
| 27-02-2023 | $34'800,000.00 |
| 27-02-2023 | $34'800,000.00 |
| 28-02-2023 | $11'600,000.00 |
| 22-06-2023 | $16'735,928.22 |
| 05-07-2023 | $17'400,000.00 |
| 01-08-2023 | $17'400,000.00 |
| 19-09-2023 | $49'386,278.46 |
| 26-09-2023 | $8'228,329.56 |
| 25-10-2023 | $13'521,633.96 |
| 25-10-2023 | $2'900,000.00 |
| 07-12-2023 | $11'600,000.00 |

| 08-12-2023 | $39'386,165.40 |
|---|---|
| 13-12-2023 | $38'280,000.00 |
| 18-12-2023 | $38'580,412.31 |

Lo anterior, se acredita con los comprobantes emitidos por MDM a favor de TV Azteca, S.A.B. de C.V. y otro, que se exhiben en formato PDF como **Anexo 11)**.

**17.-** Es el caso que, en términos de lo establecido en el Contrato Pachuca, desde por lo menos el 30 de abril de 2024 debió haberse iniciado una negociación de buena fe entre Pachuca y FSM para prorrogar la vigencia del Contrato Pachuca.

Sin embargo, dicha negociación no se llevó a cabo.

**18.-** Efectivamente, para sorpresa de FSM, el 18 de diciembre de 2024, la hoy codemandada Tubi, filial o subsidiaria de Fox Corp., que se encuentra en el sitio web [www.tubitv.com](www.tubitv.com) , publicó un comunicado en donde se señala que "Tubi transmitirá el Torneo Clausura 2025 de la Liga MX (varonil) y de la Liga MX Femenil, Juegos Locales del Club León y **del Club Pachuca**…"[6]

Lo anterior, sin que hubiere mediado negociación alguna con FSM, sin que Pachuca le hubiere notificado a FSM la oferta presentada por un tercero a fin de que FSM —en ejercicio de su derecho— pudiera igualara, y sin que se hubiera llevado a cabo cualquier acto tendiente al cumplimiento de la cláusula 7 del Contrato Pachuca, pese a ser vinculante y obligatorio para la demandada.

Esto se acredita con una impresión del comunicado de Tubi con su respectiva traducción al español, que se exhiben como **Anexo 12)**.

**19.-** De hecho, Tubi ya transmitió los partidos del Pachuca Varonil contra el Club Santos Laguna jugado el 20 de enero de 2025, contra el Atlas Futbol Club, el 1° de febrero de 2025, contra el Club León el 5 de febrero de 2025 y contra Club Universidad Nacional el 16 de febrero de 2025.

La transmisión de estos partidos pudo ser vista en la República Mexicana, ámbito principal de aplicación del Contrato Pachuca, y que amerita la intervención de su Señoría, al tenor de lo pactado en la cláusula 3 del Contrato Pachuca, según se explica en el capítulo de "Derecho" de esta demanda.

---

[6] https://corporate.tubitv.com/press/tubi-to-broadcast-live-liga-mx-and-liga-mx-femenil-games-for-free-in-mexico-and-central-america/

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6620656a6632000000000000000000000147cb

Lo anterior además de ser un hecho notorio, se acredita con el acta de fe de hechos que se exhibe como **Anexo 13).**

**20.-** Mis mandantes tienen pleno conocimiento que existe un contrato entre Fox Cable (subsidiaria o filial de Fox Corp.) y Pachuca, para la transmisión de los partidos del Pachuca Varonil, y bajo el cual, Fox Corp. (directamente y/o a través de cualquiera de sus subsidiarias y/o filiales) comercializa los partidos del Pachuca Varonil y Tubi los transmite vía internet. Dicho contrato fue celebrado en violación del derecho de preferencia expresamente establecido en favor de FSM en el Contrato Pachuca y en el Convenio Modificatorio, pues Pachuca: (i) nunca le notificó a FSM la oferta realizada por Fox Cable (o por cualquier otra subsidiaria, filial o parte relacionada de Fox Corp); y (ii) como consecuencia de la abstención descrita en el numeral (i) anterior, impidió que FSM pudiera estar en posibilidad de igualar la oferta realizada por el tercero correspondiente.

Bajo protesta de decir verdad, manifiesto que mis mandantes no cuentan con el original o copia certificada de dicho acuerdo de voluntades, por no encontrarse a su disposición ni ser parte; por lo cual, desde ahora, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, atentamente solicito se requiera a Pachuca para que exhiba el contrato que haya celebrado con Tubi y/o con Fox Cable y por virtud del cual, permita a cualquiera de estas últimas la transmisión de los partidos del Pachuca Varonil con posterioridad al Torneo Clausura 2024 de la Liga MX, especialmente el Clausura 2025 y/o cualquier otro partido del Pachuca Varonil en cualquier otro torneo nacional o internacional, jugando como local; con el apercibimiento que de no hacerlo, se le tendrán por ciertas las afirmaciones de mis mandantes vertidas en esta demanda.

**21.-** La inobservancia de Pachuca a sus obligaciones emanadas del Contrato Pachuca y su Convenio Modificatorio, —obligaciones correlativas al derecho de preferencia expresamente pactado en dicho Contrato Pachuca en favor de FSM, en su carácter de licenciatario—, consistente en la celebración del contrato con Fox Cable, sin haber dado oportunidad a FSM de ejercer el derecho de preferencia expresamente pactado en el Contrato Pachuca —para lo cual, entre otras cosas, habría tenido que notificar a mi representada cualquier oferta realizada por Fox Cable o cualquier tercero, y otorgado a mi representada un plazo de por lo menos 10 (diez) días para igualar dicha oferta (lo cual, como está acreditado en esta demanda, no ocurrió)— ocasionan a MDM daños y

perjuicios, consistentes en todas las cantidades que por concepto de pautas publicitarias y/o venta de espacios publicitarios ha recibido Tubi y/o Fox Cable; y que, en todo caso, FSM pudo haber recibido como comercializadora exclusiva de los partidos como local del Pachuca Varonil, de haberse respetado el precitado derecho de preferencia conforme al cual, FSM podía igualar la oferta que hizo Fox Corp., a través de cualquiera de sus subsidiarias y/o filiales (incluyendo, sin limitación, a Fox Cable y Tubi) para obtener tales los derechos exclusivos de transmisión.

Bajo protesta de decir verdad, manifiesto que mi representadas no cuentan con esta información, ni está a su alcance, porque no tienen relación alguna con Fox Cable y/o Tubi que así se los permita; por lo cual, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, solicito a su Señoría requiera a Fox Cable para que en un plazo perentorio, exhiba los documentos que acrediten las cantidades que obtuvo de publicidad por la transmisión de los partidos del Pachuca Varonil en contra de Club Santos Laguna jugado el 20 de enero de 2025, contra el Atlas Futbol Club, el 1° de febrero de 2025, contra el Club León el 5 de febrero de 2025 y contra Club Universidad Nacional el 16 de febrero de 2025; más los que, en su caso, obtenga por los subsecuentes partidos del Pachuca Varonil que transmita Tubi, Fox Cable y/o cualquier tercero designado o facultado por Fox Cable; con el apercibimiento que de no hacerlo, se tendrán por ciertas las afirmaciones de mis representadas vertidas en esta demanda.

**22.-** El 5 de enero de 2025 (más de seis meses después de la terminación del Contrato Pachuca, y de que se hubiera comenzado a violar el derecho de preferencia del que es titular FSM), Pachuca realizó una notificación a FSM vía notario público, a través de la cual pretendió requerir el pago de supuestas cantidades que, dice, FSM le debe; y al mismo tiempo, reconoció expresamente la existencia del derecho de preferencia contenido en el Contrato Pachuca, pues, al referirse al numeral 7 de dicho contrato, afirma lo siguiente: "*[…] dando la posibilidad a Fox[7] de igualar cualquier propuesta que le fuera planteada por algún otro interesado al Club Pachuca, teniendo Fox un plazo de 10 días para realizar lo anterior, a partir de recibir mediante notificación por escrito los términos de la propuesta realizada por algún otro interesado […]".* Si bien la existencia del derecho de preferencia en la negociación del que es titular FSM es evidente de una simple lectura del Contrato Pachuca, llama poderosamente la atención el hecho de que el propio Club Pachuca reconozca expresamente su existencia (a pesar de saber que con su conducta, descrita a

---

[7] En la notificación, el término "Fox" se refiere a FSM.

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6b20636a6632000000000000000000000147cb

lo largo de la presente demanda, ha violado abiertamente dicho derecho en perjuicio de mis mandantes).

Acompaño como **Anexo 14)**, el original de la notificación de Pachuca junto con el instructivo entregado a FSM por el notario público.

**23.-**    Sobre la competencia por sumisión expresa en materia mercantil, dispone el artículo 1093 del Código de Comercio, lo siguiente:

> "Artículo 1093.- Hay sumisión expresa cuando los interesados renuncien clara y terminantemente al fuero que la ley les concede, y para el caso de controversia, señalan como tribunales competentes **a los del domicilio de cualquiera de las partes, del lugar de cumplimiento de alguna de las obligaciones contraídas, o de la ubicación de la cosa.** En el caso de que se acuerden pluralidad de jurisdicciones, el actor podrá elegir a un tribunal competente entre cualquiera de ellas."

Conforme a dicho numeral, en materia mercantil la competencia territorial es prorrogable, toda vez que las partes de un acto jurídico pueden someterse, para el caso de controversia, a los tribunales de un determinado lugar, a través del pacto de sumisión, en el que los interesados manifiestan su voluntad en forma expresa, para que los tribunales de un determinado lugar sean competentes para conocer de un litigio futuro o presente.

Sin embargo, para que se configure esa sumisión expresa, debe existir la voluntad de las partes en renunciar al fuero que la ley les concede y que se haga la designación de tribunales competentes, **pero con la condición de que sean únicamente los del domicilio de alguna de las partes, los del lugar del cumplimiento de alguna de las obligaciones contraídas, o los del lugar de ubicación de la cosa.**

Lo anterior, porque si bien la voluntad de las partes es la ley suprema de los contratos, esa regla genérica en materia mercantil no es aplicable al pacto de sumisión, en virtud de que a éste lo rige la norma especial contenida en el artículo 1093, en relación con el diverso 1092 del mismo ordenamiento, que limita la configuración de ese pacto a los casos expresamente contenidos en el primero de estos preceptos, que son limitativos y no enunciativos, puesto que por su sentido literal y conforme a una interpretación teleológica, su finalidad fue garantizar, en la medida de lo posible, que en la materia mercantil la actividad jurisdiccional que corresponde al Estado a través de los tribunales y mediante los juicios mercantiles, se realice logrando

una justicia expedita, imparcial y completa, y esa reforma complementa las diversas constitucionales y legales aprobadas para lograr un nuevo sistema judicial que asegure a todos los mexicanos el pleno goce de su derecho de acceso a la jurisdicción.

Lo anterior, encuentra sustento en la jurisprudencia siguiente:

"COMPETENCIA POR TERRITORIO EN MATERIA MERCANTIL. SU PRÓRROGA POR PACTO DE SUMISIÓN EXPRESA ESTÁ LIMITADA A LOS CASOS PREVISTOS EN EL ARTÍCULO 1093 DEL CÓDIGO DE COMERCIO. Hechos: El peticionario de amparo se inconformó contra la determinación de la Sala responsable, de declarar que se surtía la competencia de los tribunales del entonces Distrito Federal (ahora Ciudad de México), al haber renunciado a cualquier fuero que por razón de domicilio pudiera corresponderle. El inconforme expuso que ese razonamiento es ilegal, porque no se puede señalar a los indicados tribunales como competentes, ya que no son los del domicilio de cualquiera de las partes, del lugar del cumplimiento de alguna de las obligaciones ni del lugar de ubicación de la cosa.

Criterio jurídico: Este Tribunal Colegiado de Circuito determina que la prórroga de competencia por territorio en materia mercantil por pacto de sumisión expresa, **está limitada a los casos previstos en el artículo 1093 del Código de Comercio.**

Justificación: Lo anterior, porque conforme a los artículos 1092 y 1093 del Código de Comercio, en materia mercantil la competencia territorial es prorrogable, toda vez que las partes de un acto jurídico pueden someterse, para el caso de controversia, a los tribunales de un determinado lugar, a través del pacto de sumisión, en el que los interesados manifiestan su voluntad en forma expresa, para que los tribunales de un determinado lugar sean competentes para conocer de un litigio futuro o presente; sin embargo, para que se configure esa sumisión expresa, debe existir la voluntad de las partes en renunciar al fuero que la ley les concede y que se haga la designación de tribunales competentes, pero con la condición de que sean únicamente los del domicilio de alguna de las partes, los del lugar del cumplimiento de alguna de las obligaciones contraídas, o los del lugar de ubicación de la cosa. De acuerdo con dicho precepto, ese pacto de sumisión expresa, en el que las partes prorrogan jurisdicción por razón de territorio, a diferencia de lo dispuesto en el artículo 1093 citado, antes de su reforma de 4 de enero de 1989, que permitía la sumisión expresa a cualquier tribunal, queda limitado cuando esa convención implica impedimento o denegación de acceso a la justicia, lo que puede suceder si las partes se someten a la jurisdicción de un lugar en el que ninguna de ellas tenga su domicilio, ni en él se haya pactado el cumplimiento de alguna de las obligaciones contraídas, ni sea el de la ubicación de la cosa, puesto que la necesidad de trasladarse a litigar a un lugar distinto a alguno de los precisados con antelación resultará más oneroso y puede constituir impedimento o denegación de acceso a la justicia para alguna de las partes, porque aun cuando conforme al artículo 78 del

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a6f20636a66320000000000000000000147cb

23

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51
706a6620636a6632000000000000000000147ceb

código citado, la voluntad de las partes es la ley suprema de los contratos, **esa regla genérica en materia mercantil no es aplicable al pacto de sumisión, en virtud de que a éste lo rige la norma especial contenida en el artículo 1093, en relación con el diverso 1092 referidos, que limita la configuración de ese pacto a los casos expresamente contenidos en el primero de estos preceptos, que son limitativos y no enunciativos, puesto que por su sentido literal y conforme a una interpretación teleológica, que atiende al espíritu de la iniciativa del Ejecutivo que dio origen a la reforma contenida en el decreto publicado en el Diario Oficial de la Federación de 4 de enero de 1989, la finalidad fue garantizar, en la medida de lo posible, que en la materia mercantil la actividad jurisdiccional que corresponde al Estado a través de los tribunales y mediante los juicios mercantiles, se realice logrando una justicia expedita, imparcial y completa, y esa reforma complementa las diversas constitucionales y legales aprobadas para lograr un nuevo sistema judicial que asegure a todos los mexicanos el pleno goce de su derecho de acceso a la jurisdicción."[8]**

En el caso concreto, en la cláusula 3 del Contrato Pachuca, FSLA y Pachuca pactaron lo siguiente:

"3. Ley Aplicable; Jurisdicción: El presente Contrato y todos los asuntos relacionados con el mismo se regirán por la ley de California aplicable a contratos que se celebren y que se cumplan en su totalidad en dicho estado, sin dar efecto a los principios de conflictos de leyes. Cualquier procedimiento legal que se relacione con este Contrato se instaurará y seguirá únicamente en, **y cada una de las partes en este acto se somete irrevocablemente a la jurisdicción exclusiva de, todos los tribunales estatales y federales ubicados en el Condado de Los Ángeles, Estado de California, EE.UU., a menos que dicha acción o procedimiento deba instaurarse en otro tribunal para obtener la competencia en razón de la materia sobre el asunto en controversia."**

Sin embargo, lo cierto es que:

(i)    El domicilio de Pachuca no está en el condado de Los Ángeles, California, pues como se advierte del Contrato Pachuca, su domicilio contractual es en la Ciudad de México, México;

(ii)   El domicilio de FSM, como titular de los derechos de licencia exclusivos del Contrato Pachuca, tampoco está en el condado de Los Ángeles, California, pues según consta

---

[8] Registro digital: 2026619. Instancia: Tribunales Colegiados de Circuito. Undécima Época. Materias(s): Civil. Tesis: I.3o.C. J/6 C (11a.). Fuente: Gaceta del Semanario Judicial de la Federación. Libro 26, Junio de 2023, Tomo VII, página 6384. Tipo: Jurisprudencia

en las facturas impresas y almacenadas en el **Anexo 8)**, éste se ubica en Almeria Ave. No. 357 Suite 101, CP: 33134, Coral Gables, Florida, Estados Unidos de América;

(iii)     El cumplimiento de ninguna obligación de las contenidas en el Contrato de Pachuca se da en el condado de Los Ángeles, California, sino en territorio mexicano, según se comprueba con las facturas y comprobantes de pago efectuados por FSM a Pachuca en su cuenta bancaria de Banco Mercantil del Norte, S.A., en México, y que se exhiben con esta demanda; y

(iv)     La ubicación de la cosa tampoco es en el condado de Los Ángeles, California, pues el objeto material del Contrato Pachuca es la licencia de derechos de transmisión de los partidos del Pachuca Varonil **jugando como local**, precisamente en México.

En consecuencia, dicha cláusula es nula de conformidad con lo dispuesto en los numerales 1092 y 1093 del Código de Comercio y la jurisprudencia anteriormente invocada, y por consiguiente, atento al numeral 156, fracción IV, del Código de Procedimientos Civiles para el Distrito Federal, de aplicación supletoria, atento a que el domicilio contractual de Pachuca se ubica en la Ciudad de México.

**24.-**     En consecuencia, mis representadas se ven en la imperiosa necesidad de presentar esta demanda, en la vía y forma propuestas.

### DERECHO

Son aplicables en cuanto al fondo, los artículos 78, 1092 y 1093 del Código de Comercio; 1796, 1949, 2062, 2104, 2110 y demás relativos y aplicables del Código Civil Federal.

El procedimiento se rige conforme a los artículos 1378, 1379 y demás relativos del Código de Comercio en vigor.

El presente juicio es de **cuantía indeterminada**, porque se demanda la responsabilidad civil en que incurrió Pachuca por incumplir el Contrato Pachuca, y el pago de los daños y perjuicios reclamados amerita algo más que una sencilla operación aritmética, por lo que reiteramos, la vía ordinaria

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6f620636a66320000000000000000000000000147cb

mercantil propuesta es procedente; al tenor de los criterios emitidos por el Poder Judicial Federal a este respecto[9].

Es competente este H. Juzgado para conocer del presente asunto, de acuerdo a lo dispuesto en el artículo 1090 del Código de Comercio, atendiendo a la nulidad de la que está afectada la cláusula 3 del Contrato Pachuca, conforme al cual, las partes se sometieron en principio a los tribunales del Condado de Los Ángeles, California, en los Estados Unidos de América; sin que el domicilio de FSM o Pachuca, el cumplimiento de obligaciones o la ubicación de la cosa se ubique en dicho lugar; amén de que, en dicha estipulación, las partes también añadieron que esa competencia podría prorrogarse cuando la acción o procedimiento que una de las partes ejerciera, **debiera instaurarse en otro tribunal para obtener la competencia en razón de la materia sobre el asunto en controversia**; y en este caso, el acto ilícito de Pachuca consistió en permitir que Tubi y/o Fox Cable transmitan en territorio mexicano y comercialicen los partidos del Pachuca Varonil como local, lo que faculta a mis representadas a iniciar ante su Señoría la presente acción reclamando el pago de daños y perjuicios ocasionados en territorio nacional; amén de que el domicilio contractual de Pachuca se ubica en la Ciudad de México.

## MEDIAS CAUTELARES

Con fundamento en el los artículos 1°, 5° y 17 de la Constitución Política de los Estados Unidos Mexicanos, el artículo 10 de la Declaración Universal de los Derechos del Hombre, el artículo 14.1 del Pacto Internacional de Derechos Civiles y Políticos, los artículos 8.1 y 25 de la Convención Americana sobre Derechos Humanos, los artículos 1168, fracción II, 1175, 1176 del Código de Comercio, y los artículos 384 y 388 del Código Federal de

---

[9] Al efecto, es aplicable a *contrario sensu* la ejecutoria *"JUICIO ORAL MERCANTIL. ES IMPROCEDENTE CUANDO SE DEMANDA LA RESCISIÓN DE UN CONTRATO DE COMPRAVENTA QUE NO ES DE CUANTÍA DETERMINADA, AL NO PRECISARSE EL MONTO DE LA OPERACIÓN Y NO SER POSIBLE PARA EL JUEZ OBTENERLA CON UNA SENCILLA OPERACIÓN ARITMÉTICA"*. Registro digital: 2028786. Instancia: Tribunales Colegiados de Circuito. Undécima Época. Materias(s): Civil. Tesis: XXII.3o.A.C.10 C (10a.). Fuente: Semanario Judicial de la Federación. Tipo: Aislada. Así como las tesis de jurisprudencia 1a./J. 4/2002 y 1a./J. 30/2008, de rubros: *"APELACIÓN EN MATERIA MERCANTIL. LA CUANTÍA DEL NEGOCIO PARA LOS EFECTOS DE SU PROCEDENCIA, DEBE COMPRENDER TANTO EL MONTO DE LA SUERTE PRINCIPAL, COMO EL IMPORTE DE LOS INTERESES, GASTOS, COSTAS Y DEMÁS PRESTACIONES QUE SEAN FÁCILMENTE LIQUIDABLES, A TRAVÉS DE UNA SIMPLE OPERACIÓN ARITMÉTICA."* y *"APELACIÓN EN MATERIA MERCANTIL. PARA SU PROCEDENCIA, LA CUANTÍA DEL NEGOCIO DEBE TENER COMO BASE LAS PRESTACIONES RECLAMADAS EN LA DEMANDA INICIAL Y QUE SEAN DETERMINABLES MEDIANTE UNA OPERACIÓN ARITMÉTICA."* publicadas en el Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomos XV, abril de 2002, página 23 y XXVII, junio de 2008, página 23, con números de registro digital: 187320 y 169554, respectivamente.

Procedimientos Civiles de aplicación supletoria al Código de Comercio, en atención a la tesis jurisprudencial 1a./J. 27/2013(10a.), y con el propósito de que la sentencia definitiva que llegue a dictarse en este juicio no sea un acto jurídico desprovisto de consecuencias, que vuelva ilusorio el derecho de mis mandantes a un recurso judicial efectivo, respetuosamente pido a su Señoría se sirva dictar como medidas cautelares, de naturaleza provisional:

1. **La orden judicial a Promotora del Club Pachuca, S.A. de C.V. para que se abstenga de seguir entregando a cualquier tercero distinto a México Sports Distribution, LLC (incluyendo, sin limitación, a Fox Cable Network Services, LLC y/o a Tubi, Inc.) la señal correspondiente a cualquier partido jugado por el equipo Pachuca Varonil como local.**

2. **La orden judicial a Promotora del Club Pachuca, S.A. de C.V. para que se abstenga de permitir el acceso al personal técnico designado por cualquier tercero distinto a México Sports Distribution, LLC para participar en la transmisión a los partidos jugados por Pachuca Varonil como local, para lo que, entre otras cosas, deberá abstenerse de emitir los pases de acceso al Estadio Hidalgo y/o en cualquier otra sede donde se decida llevar a cabo el juego como local del Pachuca Varonil.**

**PROCEDENCIA DE LAS MEDIDAS CAUTELARES**

En lo que concierne a las medidas cautelares solicitadas, si bien el Código de Comercio no las prevé de manera expresa en su articulado, y aún cuando el artículo 1168 de dicho ordenamiento dispone que en los juicios de orden mercantil como el que se plantea, sólo proceden las "providencias precautorias" previstas en dicho numeral (retención de persona y retención de bienes), en términos de lo ordenado por la jurisprudencia por contradicción de tesis resuelta por la H. Primera Sala de la Suprema Corte de Justicia de la Nación que a continuación se transcribe, es factible que, para salvaguardar la situación de hecho existente, se puedan aplicar supletoriamente las medidas conservativas o de aseguramiento previstas en los artículos 384 a 388 del Código Federal de Procedimientos Civiles, pues a través de éstas, puede brindarse efectividad en la impartición de justicia; de ahí que lo aquí solicitado resulte procedente.

El criterio jurisprudencial referido es del tenor literal siguiente:

"PROVIDENCIAS PRECAUTORIAS EN MATERIA MERCANTIL. CUANDO LA SOLICITUD DE LA MEDIDA NO SE FUNDA EN LOS CASOS QUE PREVÉ EL ARTÍCULO 1168 DEL CÓDIGO DE COMERCIO, LA RESTRICCIÓN CONTENIDA EN EL ARTÍCULO 1171 DE LA MISMA LEY PARA DICTARLAS, NO IMPIDE LA APLICACIÓN SUPLETORIA DE LAS MEDIDAS DE ASEGURAMIENTO PREVISTAS EN LOS NUMERALES 384 A 388 DEL CÓDIGO FEDERAL DE PROCEDIMIENTOS CIVILES (ABANDONO PARCIAL DE LAS TESIS 1a. LXXIX/2007 Y 1a. LXXXI/2007). El artículo 1168 del Código de Comercio regula como medida cautelar las que denomina providencias precautorias, las cuales sólo pueden dictarse cuando exista temor de que: I) se ausente u oculte la persona contra quien deba entablarse o se haya entablado una demanda; II) se oculten o dilapiden los bienes sobre los que ha de ejercitarse una acción real, y III) se oculten o enajenen los bienes sobre los que ha de practicarse la diligencia, siempre que la acción sea personal y el deudor no tuviera otros bienes. Por su parte, el numeral 1171 del mismo ordenamiento prevé que no pueden dictarse otras providencias precautorias que las establecidas en el propio código y que exclusivamente serán, en caso de la citada fracción I, el arraigo de la persona y, en los casos de las mencionadas fracciones II y III, el secuestro de bienes. En ese sentido, si en el Código de Comercio el legislador solamente reguló y denominó expresamente y de manera completa y cerrada la medida cautelar que denominó providencias precautorias, entonces, cuando en un juicio mercantil se plantea la solicitud de que se dicte una medida cautelar con la finalidad de que se mantenga una situación de hecho existente, y ésta no se funda en alguna de las tres hipótesis mencionadas, es inconcuso que, por un lado, el juzgador estaría impedido para dictar una providencia precautoria de las previstas en el artículo 1168 señalado y, por otro, que al no poder establecer tal providencia precautoria, resultaría inaplicable la prohibición contenida en el diverso artículo 1171, dado que la anotada prohibición sólo tiene por objeto regular los términos y las condiciones para que opere la medida cautelar denominada providencias precautorias prevista en el referido artículo 1168, y en consecuencia, tal prohibición no puede ni debe entenderse extensiva a cualquier medida cautelar que resulte legalmente aplicable a la materia mercantil. En ese sentido, ante la solicitud de una medida cautelar con la finalidad de que se mantenga una situación de hecho, que no se funde en alguna de las tres hipótesis contenidas en el artículo 1168 del Código de Comercio, **sí sería aplicable supletoriamente en términos del artículo 1054 del mismo ordenamiento, el contenido conducente del Código Federal de Procedimientos Civiles, que prevé como medida cautelar las denominadas medidas de aseguramiento, establecidas en sus artículos 384 a 388**. Lo anterior conduce a esta Sala a apartarse parcialmente del criterio contenido en las tesis aisladas 1a. LXXIX/2007 y 1a. LXXXI/2007, en la parte que prevén la intención y el alcance del contenido restrictivo del artículo 1171 del Código de Comercio."[10]

---

[10] Época: Décima. Registro: 2003884. Tipo de Tesis: Jurisprudencia. Instancia: Primera Sala. Materia (s): Civil. Fuente: Semanario Judicial de la Federación y su Gaceta. Tesis: 1a./J. 27/2013 (10a.), Libro XXI, junio de 2013, Tomo I, Pág. 552.

Como lo ha reconocido la Suprema Corte de Justicia de la Nación, existen medidas cautelares que pueden ser dictadas en un juicio mercantil distintas a las designadas como "providencias precautorias". Las "providencias precautorias" previstas en el Código de Comercio son sólo una especie del género de las "medidas cautelares". En ese sentido, se pueden dictar medidas cautelares que sean distintas a las "providencias precautorias", pues las únicas que están definidas limitativamente en el Código de Comercio son estas últimas, y no todas las medidas cautelares. Asimismo, debe destacarse que la función de los jueces va más allá de la mera aplicación de la ley, toda vez que los tribunales del Estado Mexicano deben analizar si la norma aplicable es acorde a la Constitución Federal o a los tratados internacionales en materia de derechos humanos, tal como lo estableció el Pleno de la Suprema Corte de Justicia de la Nación, con motivo del procedimiento instado para cumplir con las disposiciones de la Corte Interamericana de Derechos Humanos.

En ese sentido, las medidas que se solicitan son procedentes en términos de los hechos narrados en el capítulo respectivo y en virtud de lo que enseguida se expondrá.

Resulta de consabido derecho que la función de las medidas cautelares consiste en servir como paliativo por el tiempo que emplean los tribunales en resolver las controversias que se les plantean, con la finalidad de que la situación de las partes no empeore con motivo de la duración del proceso, a efecto de fungir como garantía provisional para que no se torne en ilusorio o imposible el cumplimiento de la eventual sentencia que se llegue a dictar en el procedimiento.

Así, en la Constitución Política de los Estados Unidos Mexicanos, se establece el derecho humano a una tutela judicial efectiva, al disponer, en su parte conducente:

> "Artículo 17. …
>
> Toda persona tiene derecho a que se le administre justicia por tribunales que estarán expeditos para impartirla en los plazos y términos que fijen las leyes, **emitiendo sus resoluciones de manera pronta, completa e imparcial.** Su servicio será gratuito, quedando, en consecuencia, prohibidas las costas judiciales.
>
> …
> Las leyes federales y locales establecerán los medios necesarios **para que se garantice la independencia de**

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6620636a6632000000000000000000147cb

**los tribunales y la plena ejecución de sus resoluciones."**

De la simple lectura que se haga al numeral transcrito, queda en evidencia que nuestra Carta Magna prevé que la autoridad jurisdiccional debe dictar sentencias que sean plenamente ejecutables, es decir, que sean eficaces, que puedan ser ejecutadas o cumplimentadas desde el punto de vista práctico a fin de lograr una tutela real a los intereses de la parte prevaleciente en un juicio.

En ese sentido, se prevé la figura de las medidas cautelares como un mecanismo que tienda a preservar los derechos e intereses durante el juicio, con la finalidad de lograr que la sentencia definitiva que en su momento sea emitida, pueda tener eficacia.

De esta suerte, la tutela judicial efectiva no sólo comprende la del dictado de sentencias definitivas, sino que también se dicten medidas cautelares en aras de lograr que la sentencia que se dicte sea eficazmente ejecutada.

Sobre este aspecto, la Convención Americana sobre Derechos Humanos, en sus artículos 8° y 25, dispone:

"Artículo 8. Garantías Judiciales

1.- Toda persona tiene derecho a ser oída, con las debidas garantías **y dentro de un plazo razonable**, por un juez o tribunal competente, independiente e imparcial, establecido con anterioridad por ley, en la sustanciación de cualquier acusación penal formulada contra ella, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter".

"Artículo 25. Protección Judicial

1. **Toda persona tiene derecho a un recurso sencillo y rápido o a cualquier otro recurso efectivo ante los jueces o tribunales competentes, que la ampare contra actos que violen sus derechos fundamentales reconocidos por la Constitución**, la ley o la presente convención, aun cuando tal violación sea cometida por personas que actúen en ejercicio de sus funciones oficiales.

2. Los Estados partes se comprometen:

a) a garantizar que la autoridad competente prevista por el sistema legal del Estado decidirá sobre los derechos de toda persona que interponga tal recurso;

b) a desarrollar las posibilidades del recurso judicial, y

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a6f620636a6632000000000000000000147cb

c)    **a garantizar el cumplimiento, por las autoridades competentes, de toda decisión que se haya estimado procedente el recurso**."

Entonces, la tutela judicial efectiva se encuentra elevada al rango de derecho fundamental.

La Corte Interamericana de Derechos Humanos determinó que el artículo 25 de la Convención Americana sobre Derechos Humanos, impone dos responsabilidades concretas al Estado. La primera, consagrar normativamente y asegurar la debida aplicación de recursos efectivos ante las autoridades competentes, que amparen a todas las personas bajo su jurisdicción contra actos que violen sus derechos fundamentales o que conlleven la determinación de los derechos y obligaciones de éstas (Caso Acevedo Jaramillo y otros vs. Perú). La segunda, garantizar los medios para ejecutar las respectivas decisiones y sentencias definitivas emitidas por tales autoridades competentes, de manera que se protejan efectivamente los derechos declarados o reconocidos (Caso Baena Ricardo y otros vs. Panamá).

Lo contrario supondría la negación misma del derecho involucrado. (Caso Acevedo Buendía y otros vs. Perú, Caso Acevedo Jaramillo y otros vs. Perú).

Como puede verse, la Corte Interamericana de Derechos Humanos, determinó el alcance del derecho fundamental a la tutela judicial efectiva, al concluir que los Estados se encuentran obligados a garantizar los medios para ejecutar las sentencias, de tal modo, que se realice una protección real de los derechos involucrados. En consecuencia, cualquier disposición que atente contra la efectiva tutela del derecho planteado, será contraria al artículo 25 de la Convención Americana sobre Derechos Humanos y, por ende, al artículo 17 de la Constitución Política.

Esto se traduce en que es obligación constitucional del Juzgador, garantizar la efectiva ejecución de una sentencia, a través de medidas cautelares, ya sea reguladas expresamente por el orden jurídico, o bien, aquellas ad hoc que el Juez estime necesarias para garantizar la tutela efectiva del derecho tutelado.

Todo lo anterior, encuentra sustento en la ejecutoria dictada por el Tercer Tribunal Colegiado en Materia Civil del Primer Circuito, en el expediente R.C. 253/2011, consultable en el sitio web del Consejo de la Judicatura

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51
706a6f620636a6f6320000000000000000000147cb

Federal[11]; y lleva a concluir que en el caso concreto, aún y cuando algunas de las medidas cautelares que se solicitan no están reguladas específicamente por el Código de Comercio, éstas encuentran sustento en los artículos 1° y 17 de la Constitución Política, en cuanto tutelan el derecho fundamental a la tutela judicial efectiva, a la luz de que lo que se pide expresamente en este caso; lo que está expresamente regulado por el artículo 384 del Código Federal de Procedimientos Civiles, de aplicación supletoria:

> "Art. 384.- Antes de iniciarse el juicio, **o durante su desarrollo,** pueden decretarse todas las medidas **necesarias para mantener la situación de hecho existente**. Estas medidas se decretarán sin audiencia de la contraparte, y no admitirán recurso alguno. La resolución que niegue la medida es apelable."

Sobre lo anterior, también resulta aplicable la siguiente jurisprudencia:

> "MEDIDAS CAUTELARES O PROVIDENCIAS PRECAUTORIAS EN LOS JUICIOS MERCANTILES. SON INHERENTES AL DERECHO A LA JURISDICCIÓN, POR LO QUE LA LIMITACIÓN DE SU OTORGAMIENTO DEBE ATENDER A UNA INTERPRETACIÓN FUNCIONAL Y CONFORME DEL ARTÍCULO 1168 DEL CÓDIGO DE COMERCIO CON LOS ARTÍCULOS 1o. Y 17 CONSTITUCIONALES. En los juicios mercantiles se pueden decretar medidas cautelares o providencias precautorias para mantener una situación preexistente, en virtud de que este tipo de instrumentos son inherentes al derecho a la jurisdicción, al tener la finalidad de hacer eficaces las sentencias de los Jueces tal como está previsto en el artículo 17, párrafo séptimo, de la Constitución Política de los Estados Unidos Mexicanos, el cual dispone que: "Las leyes federales y locales establecerán los medios necesarios para que se garantice la independencia de los tribunales y la plena ejecución de sus resoluciones.". Así la reforma publicada en el Diario Oficial de la Federación el 10 de enero de 2014 a los artículos 1168 y 1171 del Código de Comercio, **no tuvo la intención de impedir que en los juicios mercantiles se decreten las medidas o providencias cautelares necesarias para hacer efectivo el cumplimiento de las sentencias, ya que su propósito se concretó a la interpretación de reglas claras y precisas que permitan a los acreedores obtener el cobro efectivo de sus créditos insolutos, mediante la radicación de personas o la retención de bienes**. De esta manera, el texto reformado del artículo 1168, primer párrafo, invocado, que establece: "En los juicios mercantiles únicamente podrán dictarse las medidas cautelares o providencias precautorias previstas en este Código y que son las siguientes: (...)", **no debe interpretarse con un criterio de simple literalidad**, pues resultaría ser prohibitivo frente al deber del Juez ordinario de conservar subsistente la materia del juicio, lo que, desde luego, vulneraría los derechos fundamentales reconocidos por

---

[11] http://www.dgepj.cjf.gob.mx/OUT/00270000107690540003003AST.PDF

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51
706a6fd20636a6632000000000000000000000147cb

los instrumentos internacionales firmados por el Estado Mexicano y por la Constitución Política de los Estados Unidos Mexicanos, de acuerdo con su artículo 1o.; no obstante, una interpretación funcional y conforme de aquel numeral da la pauta para advertir que se trata de una norma taxativa al prever dos supuestos aplicables a determinada situación de hecho, **lo cual, sin embargo, no restringe la posibilidad del juzgador de que en cumplimiento de su función en relación con el otorgamiento y procedencia de las diferentes medidas cautelares, deben adaptarse a las circunstancias y necesidades de cada caso, pues estas medidas deben ser flexibles incluso con posibilidad de modificación según se necesite en el procedimiento en que se emitan; además, al otorgarlas, debe fundarlas y motivarlas debidamente, así como en cuanto a las garantías que se exijan, a fin de evitar abusos de las partes que las soliciten. En tal virtud, tal interpretación es acorde con los derechos fundamentales a la tutela judicial efectiva y de acceso a la impartición de justicia reconocidos tanto por el artículo constitucional en comento, como por el precepto 25 de la Convención Americana sobre Derechos Humanos."[12]**

En suma, la limitante que estableció el legislador en el artículo 1171 del Código de Comercio, de ninguna manera restringe el derecho de mis representadas para solicitar cualquier otra medida de conservación tendiente a salvaguardar el bien objeto del litigio y, por consiguiente, atento a las jurisprudencias obligatorias antes invocadas, **es aplicable al caso el diverso numeral 384 del Código Federal de Procedimientos Civiles.**

Ahora bien, tal como se desprende de lo que ha sido señalado desde el apartado relativo a los hechos del presente escrito, en este caso se cumplen los requisitos de apariencia del buen derecho, temor fundado y peligro en la demora inherentes a toda medida cautelar, ya que:

Apariencia del buen derecho: Mis representadas exhiben con su demanda, originales o copias certificadas de los documentos que se exhiben como **Anexos 4) a 13)** de este escrito.

De los referidos documentos se advierte prima facie, la procedencia de las prestaciones reclamadas, en tanto que de su sola lectura se advierte: (i) el derecho de preferencia otorgado por Pachuca a FSM para igualar la oferta de cualquier tercero interesado en adquirir la licencia de los derechos para transmitir los partidos que el Pachuca Varonil juegue como local; y (ii) que un tercero distinto a FSM -Tubi y/o Fox Cable- se encuentra actualmente

---

[12] Época: Décima Época. Registro: 2020903. Instancia: Plenos de Circuito. Tipo de Tesis: Jurisprudencia. Fuente: Gaceta del Semanario Judicial de la Federación. Libro 71, octubre de 2019, Tomo III. Materia(s): Constitucional, Civil, Civil. Tesis: PC.I.C. J/94 C (10a.). Página: 2979.

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51
706a66z0636a66320000000000000000000147cb

transmitiendo los partidos que Pachuca Varonil juega como local, a pesar de que Pachuca nunca le permitió a FSM ejercer el derecho de preferencia referido, pues en ningún momento le notificó a FSM la oferta realizada por Fox Cable (o por cualquier otra subsidiaria o afiliada de Fox Corp), lo cual era su obligación al amparo del Contrato Pachuca, y un requisito esencial para que FSM pudiera ejercer su derecho; lo que resulta suficiente, de momento, para el otorgamiento de la medida cautelar solicitada, pues de continuar Tubi (o cualquier otro tercero distinto a FSM) transmitiendo los partidos del Pachuca Varonil, se seguirán ocasionando ilícitamente daños y perjuicios a MDM.

Ahora, la verosimilitud del derecho es un presupuesto que condiciona la admisibilidad de la medida **y apunta a una credibilidad objetiva** y seria que descarta una pretensión manifiestamente infundada, temeraria o muy cuestionable. Lo cual se justifica en razón de que las medidas cautelares, más que destinarse a hacer justicia, se dirigen a dar tiempo a ésta para cumplir eficazmente su objetivo.

En este caso, la apariencia del buen derecho está ligada con la pretensión principal de que Pachuca cometió un acto ilícito, consistente en inobservar ese derecho de preferencia pactado a favor de FSM en el Contrato Pachuca, ocasionando con ello merma patrimonial y lucro cesante a MDM, como comercializador de los partidos del Pachuca Varonil.

Por lo tanto, debe suspenderse el efecto nocivo de cualquier acto celebrado en contravención a dicho derecho de preferencia, vigente, vinculante y válido de conformidad con el artículo 78 del Código de Comercio.

Temor fundado: En caso de que no se ordene que se ordene a Pachuca se abstenga de entregar la señal a Fox Cable y/o a Tubi y/o a cualquier otro tercero para transmitir partidos del Pachuca Varonil jugando como local, se permitirá que Pachuca continúe cometiendo actos ilícitos y que mis representadas continúen perdiendo la oportunidad de transmitir y comercializar los partidos del Pachuca Varonil; amén de que Tubi ya transmitió varios partidos del Pachuca Varonil jugando como local: contra Club Santos Laguna , contra Atlas Futbol Club, contra Club León y contra Club Universidad Nacional y existen cuando menos cinco partidos más en el Torneo Clausura 2025 de la Liga MX en donde Pachuca Varonil jugará como local[13], por lo que existe el temor fundado de que, ante el anuncio que efectuó Tubi -ver **Anexo 12)**- ésta (o algún otro

---

[13] Pachuca Varonil jugará como local contra Puebla, Mazatlán, Xolos, América y Tigres. Consultable en https://mexico.as.com/resultados/ficha/equipo/pachuca/4245/calendario/

tercero distinto a FSM, como Fox Cable) transmita y comercialice los próximos partidos del Pachuca Varonil jugando como local.

Peligro en la demora: Es necesaria la adopción urgente de la medida cautelar que se pide, considerando como se ha dicho, que ante el anuncio en medios, Tubi continuará transmitiendo en exclusiva los partidos del Pachuca Varonil, ante la inobservancia de Pachuca al derecho de preferencia contenido en la cláusula 7 del Contrato Pachuca; amén de que, según se aprecia del requerimiento formulado por Pachuca a FSM el 5 de febrero de 2025 -**Anexo 14)**- la hoy codemandada Pachuca pretende desconocer el derecho de preferencia contenido en la cláusula 7 del Contrato Pachuca y, encima de todo, ha requerido a FSM de pago de cantidades a las que no tiene ningún derecho.

Al efecto, son aplicables los criterios siguientes:

"SUSPENSIÓN. PARA RESOLVER SOBRE ELLA ES FACTIBLE, SIN DEJAR DE OBSERVAR LOS REQUISITOS CONTENIDOS EN EL ARTICULO 124 DE LA LEY DE AMPARO, HACER UNA APRECIACIÓN DE CARÁCTER PROVISIONAL DE LA INCONSTITUCIONALIDAD DEL ACTO RECLAMADO.- **La suspensión de los actos reclamados participa de la naturaleza de una medida cautelar, cuyos presupuestos son la apariencia del buen derecho y el peligro en la demora. El primero de ellos se basa en un conocimiento superficial dirigido a lograr una decisión de mera probabilidad respecto de la existencia del derecho discutido en el proceso. Dicho requisito aplicado a la suspensión de los actos reclamados, implica que, para la concesión de la medida**, **sin dejar de observar los requisitos contenidos en el artículo 124 de la Ley de Amparo, basta la comprobación de la apariencia del derecho invocado por el quejoso, de modo tal que, según un cálculo de probabilidades, sea posible anticipar que en la sentencia de amparo se declarará la inconstitucionalidad del acto reclamado.** Ese examen encuentra además fundamento en el artículo 107, fracción X, constitucional, en cuanto establece que para el otorgamiento de la medida suspensional deberá tomarse en cuenta, entre otros factores, la naturaleza de la violación alegada, lo que implica que debe atenderse al derecho que se dice violado. Esto es, el examen de la naturaleza de la violación alegada no sólo comprende el concepto de violación aducido por el quejoso sino que implica también el hecho o acto que entraña la violación, considerando sus características y su trascendencia. En todo caso dicho análisis debe realizarse, sin prejuzgar sobre la certeza del derecho, es decir, sobre la constitucionalidad o inconstitucionalidad de los actos reclamados, ya que esto sólo puede determinarse en la sentencia de amparo con base en un procedimiento más amplio y con mayor información, teniendo en cuenta siempre que la determinación tomada en relación con la suspensión no debe influir en la sentencia de fondo, toda vez que aquélla sólo tiene el carácter de provisional y se funda en meras hipótesis, y no en la certeza de la

35

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51
706a662065a66320000000000000000000000147cb

existencia de las pretensiones, en el entendido de que deberá sopesarse con los otros elementos requeridos para la suspensión, porque si el perjuicio al interés social o al orden público es mayor a los daños y perjuicios de difícil reparación que pueda sufrir el quejoso, deberá negarse la suspensión solicitada, ya que la preservación del orden público o del interés de la sociedad están por encima del interés particular afectado. Con este proceder, se evita el exceso en el examen que realice el juzgador, el cual siempre quedará sujeto a las reglas que rigen en materia de suspensión."[14]

"SUSPENSIÓN EN EL AMPARO INDIRECTO. RELACIÓN DEL EFECTO RESTAURATIVO, PROVISIONAL Y ANTICIPADO QUE DEBE DÁRSELE EN TÉRMINOS DEL ARTÍCULO 147, SEGUNDO PÁRRAFO, DE LA LEY DE LA MATERIA, CON LA APARIENCIA DEL BUEN DERECHO Y EL PELIGRO EN LA DEMORA. De conformidad con el artículo 147, segundo párrafo, de la Ley de Amparo, vigente desde el 3 de abril de 2013, en los casos en que la suspensión sea procedente, atento a la naturaleza del acto reclamado, el órgano jurisdiccional ordenará que las cosas se mantengan en el estado que guarden y, de ser jurídica y materialmente posible, restablecerá provisionalmente al quejoso en el goce del derecho violado, mientras se dicta sentencia ejecutoria en el amparo. Así, del dictamen efectuado en el Senado de la República a la iniciativa de dicho ordenamiento, se estima que la disposición mencionada se originó porque, conforme a la práctica jurisdiccional basada en la Ley de Amparo de 1936, se reconocieron supuestos en los que no podía otorgarse la suspensión con un alcance eficaz y consistente con las premisas de evitar la consumación de las violaciones alegadas, tornándolas difícil o imposiblemente reparables, y de salvaguarda de la materia del amparo, si no se le daba un efecto restitutorio, provisional y anticipado, por encontrarse el acto reclamado ejecutado al momento en que se solicitaba la medida y a partir de un conocimiento superficial y de mera probabilidad de la violación invocada por la parte quejosa, que diera como resultado la credibilidad objetiva y seria que descartara una pretensión manifiestamente infundada, temeraria o cuestionable (apariencia del buen derecho), así como el peligro de que, de permanecer la ejecución del acto, se frustrara la pretensión deducida por consumarse la violación y se perdiera la materia del amparo (peligro en la demora); criterios que superaron los relativos a que la suspensión solamente debía tener efectos conservatorios y de que no era posible, al resolver sobre su concesión, abordar estudio alguno sobre la constitucionalidad del acto reclamado por ser esto último materia de la sentencia que resolviera el fondo del amparo. En estas condiciones, la previsión contenida en el segundo párrafo del artículo 147 citado, encuentra estrecha relación con el asomo provisional al fondo del asunto a que está obligado el juzgador, a fin de determinar la apariencia del buen derecho, a que se refieren los artículos 107, fracción X, de la Constitución Política de los Estados Unidos Mexicanos y 138 de su ley reglamentaria, pero, fundamentalmente, lleva a que se analice el peligro en la

---

[14] Registro digital: 200136. Instancia: Pleno. Novena Época. Materia(s): Común. Tesis: P./J. 15/96. Fuente: Semanario Judicial de la Federación y su Gaceta. Tomo III, Abril de 1996, página 16. Tipo: Jurisprudencia.

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6620636a6632000000000000000000000147cb

demora, dada la naturaleza de la medida cautelar que corresponde a la suspensión del acto reclamado en el juicio de amparo, en el entendido de que el análisis condigno a tal peligro, como se entendió en el dictamen inicialmente señalado, involucra una estimación de mera probabilidad de que, de no suspenderse el acto, las violaciones aducidas quedarán consumadas y se tornarán difícil o imposiblemente reparables, esto, en el aspecto sustantivo, y desaparecerá la materia del amparo, como consecuencia adjetiva del retardo en la paralización del acto. Por ello, cuando en la misma porción normativa que se analiza se condiciona el efecto restaurativo excepcional, provisional y anticipado que pueda darse a la suspensión del acto, a que su naturaleza revele que es jurídica y materialmente posible, en la determinación de estos últimos aspectos debe involucrarse el resolver si existe verdadero peligro de que de no darse a la suspensión el efecto referido, las violaciones aducidas se consumen, se tornen difícil o aun imposiblemente reparables en la sentencia de amparo y se pierda con ello la materia de fondo del juicio principal, en el entendido también de que esas expresiones constituyen elementos normativos y de control que el legislador previó, a fin de que el otorgar a la suspensión, excepcionalmente, un efecto restaurativo, provisional y anticipado, no resulte en una decisión arbitraria o susceptible al abuso, pues de ser así, sin que se advierta el peligro en la demora y el riesgo adjetivo de que desaparezca la materia del amparo, se desvirtuaría el propósito considerado por el legislador para prever dicha medida con el alcance excepcional descrito. Todo ello, desde luego, en el entendido de que, aunado a la apariencia del buen derecho y el peligro en la demora, es inexcusable que se demuestre la no afectación al interés social con el otorgamiento de la medida y el cumplimiento de los demás requisitos previstos en la Ley de Amparo, pues de existir esa afectación y ser mayor que la que resentiría la parte quejosa, según se aprecie de sus pretensiones, la suspensión sería improcedente e innecesario un análisis en cuanto al efecto más eficaz que habría de dársele, lo que no contradice la esencia de los criterios jurisprudenciales que orientaron la adopción del actual segundo párrafo del artículo 147 de la Ley de Amparo, contenidos en las jurisprudencias P./J. 15/96 y P./J. 16/96, del Pleno de la Suprema Corte de Justicia de la Nación, emitidas con base en la Ley de Amparo actualmente abrogada, sino que, en términos del artículo sexto transitorio del ordenamiento de la materia en vigor, vistas en relación con los procesos legislativos originarios de la legislación actual, sirven de guía para determinar la naturaleza específica del juicio de ponderación sobre la apariencia del buen derecho y el peligro en la demora; sin embargo, su aplicabilidad no puede ser plena conforme a la legislación actual, porque, como se precisó, el Constituyente ordenó que se observaran mayores requisitos para normar el juicio de ponderación y el otorgamiento de la medida, con el propósito de evitar el abuso y controlar la discrecionalidad del Juez al proveer sobre su otorgamiento, con el fin de que esa discrecionalidad no resulte en arbitrariedad, con la consecuente lesión al interés social en el otorgamiento de la medida con un efecto excepcional, cuando esto no se justifica e, incluso, antes de la expedición de la ley en vigor, la propia Suprema Corte constriñó la aplicabilidad de aquellos criterios a la observancia de los requisitos del artículo 124 de la normativa abrogada y, en el imperio de la actual, debe regir el mismo principio de cumplimiento de

todos y cada uno de los que deban satisfacerse para proveer sobre la medida cautelar."[15]

Es importante destacar que, con el otorgamiento de las medidas cautelares, no se prejuzga sobre la procedencia de las prestaciones reclamadas por mis mandantes, ni los derechos de la demandada, por lo que sus acciones y medios de defensa quedan expeditos.

Alcance de las medidas:    Las medidas solicitadas están perfectamente acotadas en el tiempo, pues deben permanecer en vigor únicamente hasta el momento en que se ponga fin al presente juicio mediante sentencia que haya causado ejecutoria y solo afectan a Pachuca (y, en su caso, a cualquier tercero distinto a FSM a quien Pachuca ilícitamente le hubiere otorgado el derecho a transmitir los partidos que Pachuca Varonil juegue como local, en violación del derecho de FSM, incluyendo, sin limitar, a Tubi, Inc, y a Fox Cable Network Services, LLC), y los eventuales daños y perjuicios que se ocasionen con motivo de dicha medida, quedarán cubiertos con la fianza que al efecto fije su Señoría.

Al efecto, son aplicables los criterios siguientes:

"SUSPENSIÓN. PARA RESOLVER SOBRE ELLA ES FACTIBLE, SIN DEJAR DE OBSERVAR LOS REQUISITOS CONTENIDOS EN EL ARTICULO 124 DE LA LEY DE AMPARO, HACER UNA APRECIACIÓN DE CARÁCTER PROVISIONAL DE LA INCONSTITUCIONALIDAD DEL ACTO RECLAMADO.- La suspensión de los actos reclamados **participa de la naturaleza de una medida cautelar, cuyos presupuestos son la apariencia del buen derecho y el peligro en la demora. El primero de ellos se basa en un conocimiento superficial dirigido a lograr una decisión de mera probabilidad respecto de la existencia del derecho discutido en el proceso**. Dicho requisito aplicado a la suspensión de los actos reclamados, implica que, para la concesión de la medida, sin dejar de observar los requisitos contenidos en el artículo 124 de la Ley de Amparo, basta la comprobación de la apariencia del derecho invocado por el quejoso, de modo tal que, según un cálculo de probabilidades, sea posible anticipar que en la sentencia de amparo se declarará la inconstitucionalidad del acto reclamado. Ese examen encuentra además fundamento en el artículo 107, fracción X, constitucional, en cuanto establece que para el otorgamiento de la medida suspensional deberá tomarse en cuenta, entre otros factores, la naturaleza de la violación alegada, lo que implica que debe atenderse al derecho que se dice violado. Esto es, el examen de la naturaleza de la violación alegada no sólo comprende el

---

[15] Registro digital: 2006949. Instancia: Tribunales Colegiados de Circuito. Décima Época. Materia(s): Común. Tesis: IV.2o.A.63 K (10a.). Fuente: Gaceta del Semanario Judicial de la Federación. Libro 8, Julio de 2014, Tomo II, página 1316. Tipo: Aislada

38

concepto de violación aducido por el quejoso, sino que implica también el hecho o acto que entraña la violación, considerando sus características y su trascendencia. En todo caso dicho análisis debe realizarse, sin prejuzgar sobre la certeza del derecho, es decir, sobre la constitucionalidad o inconstitucionalidad de los actos reclamados, ya que esto sólo puede determinarse en la sentencia de amparo con base en un procedimiento más amplio y con mayor información, teniendo en cuenta siempre que la determinación tomada en relación con la suspensión no debe influir en la sentencia de fondo, toda vez que aquélla sólo tiene el carácter de provisional y se funda en meras hipótesis, y no en la certeza de la existencia de las pretensiones, en el entendido de que deberá sopesarse con los otros elementos requeridos para la suspensión, porque si el perjuicio al interés social o al orden público es mayor a los daños y perjuicios de difícil reparación que pueda sufrir el quejoso, deberá negarse la suspensión solicitada, ya que la preservación del orden público o del interés de la sociedad están por encima del interés particular afectado. Con este proceder, se evita el exceso en el examen que realice el juzgador, el cual siempre quedará sujeto a las reglas que rigen en materia de suspensión."[16]

"SUSPENSIÓN EN EL AMPARO INDIRECTO. RELACIÓN DEL EFECTO RESTAURATIVO, PROVISIONAL Y ANTICIPADO QUE DEBE DÁRSELE EN TÉRMINOS DEL ARTÍCULO 147, SEGUNDO PÁRRAFO, DE LA LEY DE LA MATERIA, CON LA APARIENCIA DEL BUEN DERECHO Y EL PELIGRO EN LA DEMORA. De conformidad con el artículo 147, segundo párrafo, de la Ley de Amparo, vigente desde el 3 de abril de 2013, en los casos en que la suspensión sea procedente, atento a la naturaleza del acto reclamado, el órgano jurisdiccional ordenará que las cosas se mantengan en el estado que guarden y, de ser jurídica y materialmente posible, restablecerá provisionalmente al quejoso en el goce del derecho violado, mientras se dicta sentencia ejecutoria en el amparo. Así, del dictamen efectuado en el Senado de la República a la iniciativa de dicho ordenamiento, se estima que la disposición mencionada se originó porque, conforme a la práctica jurisdiccional basada en la Ley de Amparo de 1936, se reconocieron supuestos en los que no podía otorgarse la suspensión con un alcance eficaz y consistente con las premisas de evitar la consumación de las violaciones alegadas, tornándolas difícil o imposiblemente reparables, y de salvaguarda de la materia del amparo, si no se le daba un efecto restitutorio, provisional y anticipado, por encontrarse el acto reclamado ejecutado al momento en que se solicitaba la medida y a partir de un conocimiento superficial y de mera probabilidad de la violación invocada por la parte quejosa, que diera como resultado la credibilidad objetiva y seria que descartara una pretensión manifiestamente infundada, temeraria o cuestionable (apariencia del buen derecho), **así como el peligro de que, de permanecer la ejecución del acto, se frustrara la pretensión deducida por consumarse la violación y se perdiera la materia del amparo (peligro en la**

---

[16] Época: Novena Época. Registro: 917974. Instancia: Pleno. Tipo de Tesis: Jurisprudencia. Fuente: Apéndice 2000. Tomo VI, Común, Jurisprudencia SCJN. Materia(s): Común. Tesis: 440. Página: 374.

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6620656a6632000000000000000000000147cb

**demora)**; criterios que superaron los relativos a que la suspensión solamente debía tener efectos conservatorios y de que no era posible, al resolver sobre su concesión, abordar estudio alguno sobre la constitucionalidad del acto reclamado por ser esto último materia de la sentencia que resolviera el fondo del amparo. En estas condiciones, la previsión contenida en el segundo párrafo del artículo 147 citado, encuentra estrecha relación con el asomo provisional al fondo del asunto a que está obligado el juzgador, a fin de determinar la apariencia del buen derecho, a que se refieren los artículos 107, fracción X, de la Constitución Política de los Estados Unidos Mexicanos y 138 de su ley reglamentaria, **pero, fundamentalmente, lleva a que se analice el peligro en la demora, dada la naturaleza de la medida cautelar que corresponde a la suspensión del acto reclamado en el juicio de amparo, en el entendido de que el análisis condigno a tal peligro, como se entendió en el dictamen inicialmente señalado, involucra una estimación de mera probabilidad de que, de no suspenderse el acto, las violaciones aducidas quedarán consumadas y se tornarán difícil o imposiblemente reparables, esto, en el aspecto sustantivo, y desaparecerá la materia del amparo, como consecuencia adjetiva del retardo en la paralización del acto.** Por ello, cuando en la misma porción normativa que se analiza se condiciona el efecto restaurativo excepcional, provisional y anticipado que pueda darse a la suspensión del acto, a que su naturaleza revele que es jurídica y materialmente posible, en la determinación de estos últimos aspectos debe involucrarse el resolver si existe verdadero peligro de que de no darse a la suspensión el efecto referido, las violaciones aducidas se consumen, se tornen difícil o aun imposiblemente reparables en la sentencia de amparo y se pierda con ello la materia de fondo del juicio principal, en el entendido también de que esas expresiones constituyen elementos normativos y de control que el legislador previó, a fin de que el otorgar a la suspensión, excepcionalmente, un efecto restaurativo, provisional y anticipado, no resulte en una decisión arbitraria o susceptible al abuso, pues de ser así, sin que se advierta el peligro en la demora y el riesgo adjetivo de que desaparezca la materia del amparo, se desvirtuaría el propósito considerado por el legislador para prever dicha medida con el alcance excepcional descrito. Todo ello, desde luego, en el entendido de que, aunado a la apariencia del buen derecho y el peligro en la demora, es inexcusable que se demuestre la no afectación al interés social con el otorgamiento de la medida y el cumplimiento de los demás requisitos previstos en la Ley de Amparo, pues de existir esa afectación y ser mayor que la que resentiría la parte quejosa, según se aprecie de sus pretensiones, la suspensión sería improcedente e innecesario un análisis en cuanto al efecto más eficaz que habría de dársele, lo que no contradice la esencia de los criterios jurisprudenciales que orientaron la adopción del actual segundo párrafo del artículo 147 de la Ley de Amparo, contenidos en las jurisprudencias P./J. 15/96 y P./J. 16/96, del Pleno de la Suprema Corte de Justicia de la Nación, emitidas con base en la Ley de Amparo actualmente abrogada, sino que, en términos del artículo sexto transitorio del ordenamiento de la materia en vigor, vistas en relación con los procesos legislativos originarios de la legislación actual, sirven de guía para determinar la naturaleza específica del juicio de ponderación sobre la apariencia del buen derecho y el peligro en la demora; sin

embargo, su aplicabilidad no puede ser plena conforme a la legislación actual, porque, como se precisó, el Constituyente ordenó que se observaran mayores requisitos para normar el juicio de ponderación y el otorgamiento de la medida, con el propósito de evitar el abuso y controlar la discrecionalidad del Juez al proveer sobre su otorgamiento, con el fin de que esa discrecionalidad no resulte en arbitrariedad, con la consecuente lesión al interés social en el otorgamiento de la medida con un efecto excepcional, cuando esto no se justifica e, incluso, antes de la expedición de la ley en vigor, la propia Suprema Corte constriñó la aplicabilidad de aquellos criterios a la observancia de los requisitos del artículo 124 de la normativa abrogada y, en el imperio de la actual, debe regir el mismo principio de cumplimiento de todos y cada uno de los que deban satisfacerse para proveer sobre la medida cautelar."[17]

De conformidad con el artículo 1378, fracción VIII, del Código de Comercio, y sin que ello agote el derecho previsto en el numeral 1383 del mismo ordenamiento, mis mandantes ofrecen las siguientes:

**PRUEBAS**

**1.- LA CONFESIONAL**, a cargo de Promotora del Club Pachuca, S.A. de C.V., por conducto de apoderado con facultades suficientes para absolver posiciones; a quien habrá de citársele en el domicilio que señale en autos, a fin de que comparezca a ese H. Juzgado a absolver las posiciones que se le formularán el día y hora que al efecto se señale, al tenor del pliego de posiciones que en su momento será exhibido; bajo el apercibimiento que, de no comparecer sin justa causa, se le declarará confeso de las que previamente sean calificadas por su Señoría.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará, entre otras cosas, que dicha persona moral celebró el Contrato Pachuca y el Convenio Modificatorio; el contenido de la cláusula 7 y el derecho de preferencia en él contenido; que requirió a FSM de pago y en su notificación de 5 de febrero de 2025 pretendió reconoció la existencia de tal derecho; que celebró contrato con Fox Cable y/o con Tubi y/o con cualquier otro tercero distinto a FSM para la transmisión de los partidos del Pachuca Varonil jugando como local, en inobservancia al derecho de preferencia antes invocado.

---

[17] Época: Décima Época. Registro: 2006949. Instancia: Tribunales Colegiados de Circuito. Tipo de Tesis: Aislada. Fuente: Gaceta del Semanario Judicial de la Federación. Libro 8, Julio de 2014, Tomo II. Materia(s): Común. Tesis: IV.2o.A.63 K (10a.). Página: 1316

La razón por la cual se estima que quedarán acreditados tales extremos, es que de las respuestas que vierta el absolvente, su Señoría se percatará de la procedencia de la acción y las prestaciones reclamadas.

**2.-** **LA CONFESIONAL**, a cargo de Tubi, Inc., por conducto de apoderado con facultades suficientes para absolver posiciones; a quien habrá de citársele en el domicilio que señale en autos, a fin de que comparezca a ese H. Juzgado a absolver las posiciones que se le formularán el día y hora que al efecto se señale, al tenor del pliego de posiciones que en su momento será exhibido; bajo el apercibimiento que, de no comparecer sin justa causa, se le declarará confeso de las que previamente sean calificadas por su Señoría.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará, entre otras cosas, que dicha persona moral transmite los partidos del Pachuca Varonil jugando como local, según lo informó a los medios desde el 18 de diciembre de 2024; y los que haya transmitido a la fecha; colaborando así con la conducta ilícita de Pachuca al transmitir los partidos de local del Pachuca Varonil al amparo de un contrato cuya ilicitud —derivada de estar celebrado en violación del derecho de preferencia establecido en favor de FSM— conoce—.

La razón por la cual se estima que quedarán acreditados tales extremos, es que de las respuestas que vierta el absolvente, su Señoría se percatará de la procedencia de la acción y las prestaciones reclamadas.

**3.-** **LA CONFESIONAL**, a cargo de Fox Cable Networks, LLC, por conducto de apoderado con facultades suficientes para absolver posiciones; a quien habrá de citársele en el domicilio que señale en autos, a fin de que comparezca a ese H. Juzgado a absolver las posiciones que se le formularán el día y hora que al efecto se señale, al tenor del pliego de posiciones que en su momento será exhibido; bajo el apercibimiento que, de no comparecer sin justa causa, se le declarará confeso de las que previamente sean calificadas por su Señoría.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará, entre otras cosas, que dicha persona moral celebró un contrato con Pachuca en violación del derecho de preferencia de FSM (violación de la que tenía conocimiento), y que comercializa (directamente y/o a través de cualquiera de sus subsidiarias o filiales) los partidos del Pachuca Varonil jugando como local;; colaborando así

con la conducta ilícita de Pachuca al haber celebrado con este último un contrato cuya ilicitud —derivada de estar celebrado en violación del derecho de preferencia establecido en favor de FSM— conoce—.

La razón por la cual se estima que quedarán acreditados tales extremos, es que de las respuestas que vierta el absolvente, su Señoría se percatará de la procedencia de la acción y las prestaciones reclamadas.

**4.- LA DOCUMENTAL**, consistente en copia del Contrato Pachuca y su respectiva traducción al español.

Bajo protesta de decir verdad, manifiesto que mis representadas no cuentan con este documento en original o en copia certificada, en tanto que nunca les fue entregado por FSLA; por lo cual, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, solicito a su Señoría requiera a Pachuca para que al momento de dar contestación a la demanda, exhiba el mismo en original o en copia certificada; con el apercibimiento que de no hacerlo, se tendrán por ciertas las afirmaciones de mis representadas vertidas en esta demanda. Sin perjuicio de lo anterior, se exhibe copia del Contrato Pachuca, con su respectiva traducción al español por perito autorizado de ese H. Tribunal, como **Anexo 4)**.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditarán las obligaciones asumidas por las partes en dicho acuerdo de voluntades.

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata del contrato que vincula a FSM con Pachuca, y en el que se contiene el derecho de preferencia violentado por dicha codemandada.

**5.- LA DOCUMENTAL**, consistente en el convenio modificatorio al Contrato Pachuca de 4 de octubre de 2017 entre FSM y Pachuca y su respectiva traducción al español.

Bajo protesta de decir verdad, manifiesto que mis representadas no cuentan con este documento en original o en copia certificada, en tanto que nunca les fue entregado por FSLA; por lo cual, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, solicito a su Señoría requiera a Pachuca para que al momento de dar contestación a la

demanda, exhiba el mismo en original o en copia certificada; con el apercibimiento que de no hacerlo, se tendrán por ciertas las afirmaciones de mis representadas vertidas en esta demanda. Sin perjuicio de lo anterior, se exhibe copia del Convenio Modificatorio, con su respectiva traducción al español por perito autorizado de ese H. Tribunal, como **Anexo 5)**.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditarán las obligaciones asumidas por las partes en dicho acuerdo de voluntades.

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata del convenio modificatorio al contrato que vincula a FSM con Pachuca, y en el que se contiene el derecho de preferencia violentado por dicha codemandada.

**6.- LA DOCUMENTAL**, consistente en un ejemplar de la cesión celebrada entre FSLA y FSM, con su respectiva traducción al español; que se exhibe como **Anexo 6).**

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditarán las obligaciones asumidas por las partes en dicho acuerdo de voluntades.

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata de la cesión de derechos del Contrato Pachuca a favor de FSM.

**7.- LA DOCUMENTAL**, consistente en la misiva entregada vía correo electrónico a Pachuca del contrato de cesión entre FSLA y FSM; que en inglés y su traducción al español se exhibe como **Anexo 7).**

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que Pachuca tuvo conocimiento de que FSM es el nuevo titular del Contrato Pachuca y su convenio modificatorio.

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata del documento a través del cual mi mandante acredita su legitimación activa en este juicio.

44

ROGELIO ARTURO ISLAS PEREZ  04/07/25 13:33:51
706a6f62065faa6632000000000000000000000000147cb

**8.-    LA DOCUMENTAL**, consistente en impresiones de las facturas expedidas por Pachuca a FSM a favor de FSM de 2022 a 2024; y en un medio de almacenamiento electrónico USB que contiene dichas facturas en formatos PDF y XML; y que en conjunto se exhiben como **Anexo 8)**.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que Pachuca tuvo conocimiento de que FSM era el nuevo titular del Contrato Pachuca y su convenio modificatorio, y que Pachuca consintió la cesión que dio lugar a la sustitución del titular; que al tenor del Contrato Pachuca, Pachuca expidió a FSM facturas por concepto de contraprestación por los derechos exclusivos de transmisión.

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata de un documento a través del cual mi mandante acredita su legitimación activa en este juicio

**9.-    LAS DOCUMENTALES**, consistentes en impresiones de los pagos efectuados por FSM a favor de Pachuca; mismos que se exhiben en conjunto como **Anexo 9).**

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que Pachuca tuvo conocimiento de que FSM era el nuevo titular del Contrato Pachuca y su convenio modificatorio, y que Pachuca consintió la cesión que dio lugar a la sustitución del titular.

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata de comprobantes que demuestran los pagos efectuados por FSM a Pachuca y que ésta recibió sin condición alguna.

**10.-    LA DOCUMENTAL**, consistente en el instrumento público número 139,540 de 11 de febrero de 2025, otorgado ante la fe del licenciado Alfonso Zermeño Infante, Notario Público número 5 de la Ciudad de México; que se exhibe como **Anexo 10)**.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que FSM transmitió los partidos del Pachuca Varonil, en los términos del Contrato Pachuca, a través de los canales de Fox Sports México.

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51 706a662f636a663200000000000000000000000147cb

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata de una documental pública con pleno valor probatorio.

**11.- LAS DOCUMENTALES**, consistentes en los comprobantes emitidos por FSM a favor de TV Azteca, S.A.B. de C.V. y otro, que se exhiben como **Anexo 11)**.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que MDM obtiene ingresos por la transmisión de anuncios durante los eventos deportivos que FSM tiene derecho a transmitir —entre lo que, en su momento, destacaban los partidos que el Pachuca Varonil jugara como local—.

La razón por la cual se estima que con esta prueba se demuestran mis afirmaciones, es que se trata precisamente de los comprobantes emitidos por FSM a favor de TV Azteca, S.A.B. de C.V.

**12.-    LA DOCUMENTAL**, consistente en la impresión de 18 de diciembre del comunicado de Tubi con su respectiva traducción al español, que se exhiben como **Anexo 12)**.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que Tubi transmite los partidos del Pachuca Varonil, interfiriendo con el derecho de preferencia pactado a favor de FSM en el Contrato Pachuca.

La razón por la cual se estima que con esta prueba se demuestran mis afirmaciones, es que se trata del aviso que Tubi dio en medios de comunicación para los efectos de las transmisiones vía internet de los partidos del Pachuca Varonil jugando como local.

**13.-    LA DOCUMENTAL**, consistente en el acta de fe de hechos que contiene evidencia de la transmisión del partido del Pachuca Varonil en contra del  Atlas Futbol Club; que se exhibe como **Anexo 13).**

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que Tubi

transmite los partidos del Pachuca Varonil, interfiriendo con el derecho de preferencia pactado a favor de FSM en el Contrato Pachuca.

La razón por la cual se estima que con esta prueba se demuestran mis afirmaciones, es que se trata de una documental pública con pleno valor probatorio.

**14.- LA DOCUMENTAL**, consistente en la notificación entregada por Pachuca a FSM el 5 de febrero de 2025, vía notario público, y el instructivo entregado por dicho fedatario; que se exhiben como **Anexo 14).**

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que Pachuca ha reconocido expresamente la existencia del derecho de preferencia que pactó a favor de FSM en el Contrato Pachuca.

La razón por la cual se estima que con esta prueba se demuestran mis afirmaciones, es que se trata de un documento proveniente de Pachuca, por lo que prueba plenamente en su contra.

**15.- LA DOCUMENTAL**, consistente en el contrato de licencia —o cualquier otro contrato que tenga por objeto, entre otros, los derechos de transmisión de los partidos que el Pachuca Varonil juegue como local— que hayan celebrado Pachuca y Fox Cable y/o Tubi.

Bajo protesta de decir verdad, manifiesto que mis mandantes no cuentan con el original o copia certificada de dicho acuerdo de voluntades, por no ser parte y no estar a su disposición; por lo cual, desde ahora, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, atentamente solicito se requiera a Pachuca para que exhiba el contrato que haya celebrado con Tubi y/o con Fox Cable y por virtud del cual, permita a cualquiera de estas últimas la transmisión de los partidos del Pachuca Varonil con posterioridad al Torneo Clausura 2024 de la Liga MX, especialmente el Clausura 2025 y/o cualquier otro partido del Pachuca Varonil en cualquier otro torneo nacional o internacional, jugando como local; con el apercibimiento que de no hacerlo, se le tendrán por ciertas las afirmaciones de mis mandantes vertidas en esta demanda.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditará que Pachuca

47

violó el derecho de preferencia previsto en la cláusula 7 del Contrato Pachuca, al celebrar dicho acto jurídico.

La razón por la cual se estima que con esta prueba se demuestran mis afirmaciones, es que se trata de un contrato celebrado por un tercero ajeno a mis representados con Pachuca, cuyo objeto es igual o semejante al Contrato Pachuca; sin que al efecto, Pachuca haya informado de la oferta respectiva a MSN, para que ésta pudiera igualarla.

**16.-** **LAS DOCUMENTALES**, consistentes en los comprobantes que demuestren los montos que obtuvo Fox Cable y/o Tubi y/o cualquier subsidiaria y/o afiliada de dichas personas, por la comercialización de espacios publicitarios en los partidos del Pachuca Varonil contra el Club Santos Laguna jugado el 20 de enero de 2025, contra el Atlas Futbol Club, el 1° de febrero de 2025, contra el Club León el 5 de febrero de 2025 y contra Club Universidad Nacional el 16 de febrero de 2025.

Bajo protesta de decir verdad, manifiesto que mi representadas no cuentan con esta información, ni está a su alcance, porque no tienen relación alguna con Fox Cable y/o Tubi que así se los permita; por lo cual, con fundamento en el artículo 89 del Código Federal de Procedimientos Civiles, de aplicación supletoria, solicito a su Señoría requiera a Fox Cable para que en un plazo perentorio, exhiba los documentos que acrediten las cantidades que obtuvo de publicidad por la comercialización de los partidos del Pachuca Varonil en contra de Club Santos Laguna jugado el 20 de enero de 2025, contra el Atlas Futbol Club, el 1° de febrero de 2025, contra el Club León el 5 de febrero de 2025 y contra Club Universidad Nacional el 16 de febrero de 2025; más los que, en su caso, obtenga por los subsecuentes partidos del Pachuca Varonil que Tubi; con el apercibimiento que de no hacerlo, se tendrán por ciertas las afirmaciones de mis representadas vertidas en esta demanda.

Esta prueba la relaciono con todos los hechos de la demanda y con la medida cautelar solicitada, y con la misma se acreditarán los daños y perjuicios ocasionados a MDM, por todo el dinero que en su caso pudo obtener por la comercialización de dichos partidos, en caso de que Pachuca hubiese respetado el derecho de preferencia previsto en la cláusula 7 del Contrato Pachuca.

ROGELIO ARTURO ISLAS PEREZ 04/07/25 13:33:51
706a6f620636a6632000000000000000000147cb

La razón por la cual se estima que con esta prueba se demostrarán mis afirmaciones, es que se trata de información que proviene de Tubi y/o de Fox Cable, por lo que probará plenamente en su contra.

**17.- LA INSTRUMENTAL DE ACTUACIONES,** consistente en todo lo actuado en el presente juicio, en lo que favorezca a los intereses de mis representadas.

Esta prueba se relaciona con todos los hechos de esta demanda y con todas las manifestaciones vertidas en el capítulo de medidas cautelares, y con la misma, se acreditará su procedencia.

**18.- LA PRESUNCIONAL,** en su doble aspecto, legal y humana, en todo lo que favorezca a los intereses de mis representadas.

Esta prueba se relaciona con todos los hechos de esta demanda y con todas las manifestaciones vertidas en el capítulo de medidas cautelares, y con la misma, se acreditará su procedencia.

### SOLICITUD DE CARTA ROGATORIA

Con fundamento en el artículo 1072 del Código de Comercio, atentamente solicito se gire atenta carta rogatoria con los insertos al C. Juez competente en Los Ángeles, California, Estados Unidos de América, para que por su conducto, se emplace a este juicio a Tubi y a Fox Cable en el domicilio anteriormente proporcionado; solicitando desde ahora se conceda un plazo no menor a 30 días hábiles a mis representadas para exhibir las traducciones respectivas; solicitando que la carta rogatoria respectiva se ponga a disposición de mis poderdantes, por conducto de cualesquiera personas autorizadas, para entregarla ante la Secretaría de Relaciones Exteriores.

### RESERVA DE DERECHOS

En tanto que Fox Corp., y diversas de sus subsidiarias, afiliadas y/o partes relacionadas han incurrido en conductas ilícitas y contrarias a las buenas costumbres, que independientemente de lo aquí reclamado, generaron daños y perjuicios, mis representadas se reservan expresamente los derechos que les asisten para ejercerlos en contra de Fox Corp., y/o cualesquiera de sus subsidiarias, afiliadas y/o partes relacionadas, en la vía y forma que legalmente corresponda.

ROGELIO ARTURO ISLAS PEREZ   04/07/25 13:33:51
706a6f620636a663200000000000000000000147cb

Por lo expuesto;

**A USTED C. JUEZ,** atentamente pido:

**PRIMERO.-** Reconocer la personalidad que ostento, en mi carácter de apoderado general para pleitos y cobranzas de Media Deportes México, S. de R.L. de C.V. y de Mexico Sports Distribution, LLC; en mérito de los instrumentos notariales que se exhiben con este escrito, solicitando su devolución previo cotejo y compulsa que se haga con las fotostáticas adjuntas.

**SEGUNDO.-** Por señalado el domicilio procesal que se indica y por autorizadas a las personas que se mencionan para los fines precisados.

**TERCERO.-** Admitir la presente demanda en la vía y forma propuestas, mandando emplazar a la codemandada Promotora del Club Pachuca, S.A. de C.V:, en el domicilio que para tal efecto se ha precisado, apercibiéndola en términos de ley para el caso de no señalar domicilio dentro de esta jurisdicción y no conteste la demanda entablada en su contra.

**CUARTO.-** Girar carta rogatoria al C. Juez competente en Los Ángeles, California, Estados Unidos de América, para que por su conducto se sirva emplazar a las codemandadas Fox Cable Network Services, LLC y Tubi, Inc.

**QUINTO.-** Decretar la medida cautelar que se solicita, fijando al efecto la garantía que legalmente corresponda.

**SEXTO.-** En su oportunidad, dictar sentencia que condene a la demandada al pago y cumplimiento de las prestaciones que le son reclamadas en este escrito.

Protesto lo necesario

Ciudad de México, a 20 de febrero de 2025

**ROGELIO ARTURO ISLAS PÉREZ**



**EVIDENCIA CRIPTOGRAFICA - TRANSACCION**

**Archivo Firmado: lauman-fox-pachuca-demandaversionfinalpdf.pdf**
**Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal**
**Firmante(s): 1**
**Hoja(s): 50**                                   **Folio: 0BA2A1F0-C75A-4698-B9B3-BD82B15EB528**

| Firmantes | | Firmas | | |
|---|---|---|---|---|
| **Nombre(s):** | ROGELIO ARTURO ISLAS PEREZ | **Validez:** Vigente | **No Serie:** | 70.6a.66.20.63.6a.66.32.00.00.00.00.00.00.00.00.01.47.cb |

| OCSP | |
|---|---|
| **Fecha: (UTC / CDMX)** | 20/02/25 21:55:18 - 20/02/25 15:55:18 |
| **Nombre del respondedor(es):** | Servicio OCSP ACI del Consejo de la Judicatura Federal |
| **Emisor(es) del respondedor(es):** | Autoridad Certificadora Intermedia del Consejo de la Judicatura Federal |
| **Numero(s) de serie:** | 70.6a.66.32.20.63.6a.66.6f.63.73.70 |

| TSP | |
|---|---|
| **Fecha: (UTC / CDMX)** | 20/02/25 21:55:19 - 20/02/25 15:55:19 |
| **Nombre del emisor de la respuesta TSP:** | Entidad Emisora de Sellos de Tiempo del Poder Judicial de la Ciudad de México |
| **Emisor del certificado TSP:** | Autoridad Certificadora del Poder Judicial de la Ciudad de México |

| Sellos Digitales |
|---|
| 3b f8 ef 94 43 7d cb b9 80 dc b8 b6 e4 d8 de 9a 85 89 1f a0 ab 0b 7a c2 a8 ef ec 35 76 1c 11 4e 97 e6 3a 7b 00 2e 31 f9 0b 2c 10 |