1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


FOX CABLE NETWORK SERVICES      ) Case No. CV 25-2444-JFW (ASx)
LLC, et al.,                    )
                                ) Los Angeles, California
        Plaintiffs,             ) Tuesday, October 21, 2025
                                ) 10:05 A.M. to 10:50 A.M.
            v.                  )
                                ) TELEPHONIC HEARING
GRUPO LAUMAN HOLDING,           )
S. DE R.L. DE C.V., et al.,     )
                                )
        Defendants.             )
_____)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE


Appearances:              See Page 2

Deputy Clerk:             Alma Felix

Court Reporter:           Recorded; CourtSmart

Transcription Service:    JAMS Certified Transcription
                          16000 Ventura Boulevard #1010
                          Encino, California  91436
                          (661) 609-4528


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:        Ellis George LLP
                           By:   DAVID J. CARROLL
                           2121 Avenue of the Stars, 30th Floor
                           Los Angeles, California  90067
                           (310) 274-7100
                           dcarroll@ellisgeorge.com


For the Defendants:        Nassiri and Jung LLP
                           By:   JAIME DORENBAUM
                           707 Wilshire Boulevard, 46th Floor
                           Los Angeles, California  90017
                           (213) 626-6200
                           jaime@njfirm.com

LOS ANGELES, CALIFORNIA, TUESDAY, OCTOBER 21, 2025, 10:05 A.M.

THE CLERK:  Good morning, everyone.  Calling Case No. CV 25-2444-JFW (ASx), *Fox Cable Network Services LLC, et al. v. Grupo Lauman Holding, S. de R.L. de C.V., et al.*

Beginning with plaintiffs' counsel, please state your appearance for the record.

DAVID J. CARROLL:  David Carroll appearing on behalf of Plaintiffs Fox Cable Network Services and Tubi, Inc.

THE COURT: Okay.  Good morning.

MR. CARROLL:  Good morning, Your Honor.

JAIME DORENBAUM:  Good morning, Your Honor. Jaime Dorenbaum on behalf of Defendant Mexico Sports Distribution LLC.

THE COURT:  Okay.  Good morning.

This is the hearing on the motion -- plaintiffs' motion to compel further responses to its discovery requests. The motion was filed at Docket 78, and then the notice of errata regarding the proposed order was filed after that. Was anything else filed in connection with this motion other than the parties' joint stipulation?

MR. CARROLL:  Yes, Your Honor.  Plaintiffs filed a supplemental memorandum under Local Rule 37 as well.

THE COURT:  Did we get -- yeah.  Okay.

All right.  Let me go through these requests, and we will sort of do this in pretty much the order in which it was briefed but broken down into categories.

So the first issue are the discovery requests that relate to the alter-ego allegations, and I have -- you know, after reviewing the parties' respective arguments on that, I think the law is pretty clear that in a situation where the plaintiff is seeking discovery relating to defendants' liability -- not the liability of the other defendants -- I'm not talking -- when I say "defendant," I'm talking about MSD. There are other defendants in this case that have not yet been served, and I think MSD's main argument is they should not be required to turn over discovery regarding these other defendants who have not been served until they are served on the theory that somehow that's not relevant but the -- what I think plaintiff is getting at is MSD's liability premised on their theory that there are alter-egos of the other defendants, and so I think, because that is the purpose of this discovery, plaintiff is entitled to that alter-ego discovery that they seek.

To the extent that MSD claims that production of these requests is unduly -- or would be unduly burdensome, I don't think they've come anywhere close to, you know, establishing that.  They haven't sort of demonstrated in any way how that would be -- I mean, all discovery production is

burdensome.  The issue is, is it unduly burdensome?  And so they haven't, you know, established, and it is their burden to determine whether it's unduly burdensome.

With respect to their objections regarding confidentiality, if there -- is there a protective order that's been issued in this case?

MR. DORENBAUM:  No, Your Honor.  There's been no protective order issued, and that's actually one of the main issues, I think, that is delaying discovery here.

THE COURT:  Okay.  So I think if you submit a protective order -- and I have a template that you can use that's on my Procedures page -- then any concerns regarding confidentiality can be addressed through the protective order.  You just would designate those responses under the protective order.

And so my inclination is to grant the motion to compel RFPs 3, 5 through 14, 17 through 26, 49, 54 through 64, 66, and 67, and RFAs 1 through 48, 62 to 67, 75 to 102.

Do you want to be heard further on that, Mr. Dorenbaum?

MR. DORENBAUM:  Yes, Your Honor.

There are -- and I'm wondering if the Court still intends to go over -- there are -- apart from the alter-ego arguments, there are objections on those specific requests that we think still merit analysis and argument.

THE COURT:  Okay.

MR. DORENBAUM:  For example -- specifically regarding the scope of the requests.  And I'll just raise two issues that I think are emblematic in Requests 3 and 5 --

THE COURT:  Okay.

MR. DORENBAUM:  -- that I think can be applied generally throughout.

So with respect to the scope, in the requests for production, plaintiffs have not limited their requests to time period as a general matter and the -- this case really regards a discrete time period, and so we'd request that the Court agree and limit the scope of the requests to a relevant time period.  We've proposed to define that time period -- let me double-check our specific --

THE COURT:  I think here -- I think you were -- you made the argument that it should be limited to January 2023 to --

MR. DORENBAUM:  Correct.

THE COURT:  -- December 2024, and plaintiffs are saying that they are entitled to documents from January 2019 to the present.  So I think -- you know, with respect to the information that they're seeking relating to alter-egos, these alter-ego relationships were not confined to the 2023-2024 period, they do go back, and so I think that -- you know, again, if your argument is that it's not relevant, I

think that it is, and I think they can go back to 2019, and to the extent that it's -- you know, again, I've already ruled on your unduly burdensome argument.  You haven't established that.  And I do --

MR. DORENBAUM:  Your Honor -- oh, sorry.

THE COURT:  -- and I do see that the allegations in the Complaint are that defendants interfered with plaintiffs' prospective economic advantage by tarnishing its, you know, name brand and trademarks and going back at least as back as 2021.  So I don't see, really, any issues with the 2019 to -- I guess why -- why is plaintiff asking for 2019 to the present and not to December of -- December 31, 2024?

MR. CARROLL:  (Inaudible), Your Honor.

I think we are seeking that -- I don't think there's that much difference in the time period because, when we served these requests, they were approximately in, I think, April of 2025 so it's only a five- -- four- or five- month difference right there in the time period.  I think our concern was to the extent that they are still coming and going assets and one entity is undercapitalized, for example, an unable to pay a judgment in this case owed by another that that would still be relevant up to the present time period. But as I said, I don't think there's too much difference in between December 31, 2024, and May of 2025.

THE COURT:  All right.  Do you want to respond to

that --

MR. DORENBAUM:  Your Honor --

THE COURT:  -- Mr. Dorenbaum.

MR. DORENBAUM:  I'm sorry.  I didn't mean to interrupt.  Sorry.

THE COURT:  No.  Go ahead.

MR. DORENBAUM:  Going back to 2019, Your Honor -- I think the undisputed facts in this case don't warrant going back that far.  Grupo Lauman -- just as a general background here, Grupo Lauman -- the Defendant Lauman, which is alleged to own MSD and some of the other entities that -- who are named as defendants, purchased MSD -- actually came into control of MSD in 2021.  So it had no relationship to MSD prior to 2021.  MSD was originally -- my understanding is a company created by Fox's predecessor.  It was involved in a merger transaction between Fox and Disney that initiated in 2019, and the MSD portion of that merger was spun off to Grupo Lauman in 2021, two years after the merger.

THE COURT:  Uh-huh.

MR. DORENBAUM:  And so there really -- I mean, in terms of an alter ego involving the named defendants here, I'm not sure that going back to 2019 is relevant because of the factual background.

THE COURT:  So for Request No. 5, you are seeking to go back to 2021?

MR. DORENBAUM:  I would go back to 2023.  I understand the Court's position that the claims should not be limited to 2023.  I respectfully disagree with the Court, but at the very least, Your Honor, I don't think that 2019 is warranted because Grupo Lauman and the other Mexico defendants were not involved at all prior to 2021.

THE COURT:  Okay.

So, Mr. Carroll, why can't we go back to 2021?  Why do we have to go back to 2019?

MR. CARROLL:  So -- pardon me, Your Honor -- plaintiffs do make allegations that there has been conduct that sort of satisfies the alter-ego factors as far back as 2019, and I would point the Court to paragraphs 18 and 19 of our Second Amended Complaint.  They -- there -- I think those provisions are under seal so I don't want to repeat the allegations in open court, but I think that was the basis for us wanting to go back to 2019 with respect to our alter-ego allegations.

And I think, you know, with respect to the explanation that there was no relationship prior to 2021, I mean, during the meet-and-confers in this particular matter, that hasn't been offered as a reason why the timeframe should be limited to 2021 instead of 2019, and so I'm not -- sort of sitting here at this hearing, I'm not sure that I would necessarily agree that that explanation would preclude any

alter-ego discovery prior to 2021.

But I think I'd also say, if there's no relationship between Grupo Lauman and Mexico Sports Distribution prior to 2021, then there really shouldn't be much to -- much of anything to produce prior to 2021.  So having it start at 2019 I don't think makes a -- like, makes a lot of difference based on that explanation, and I think, as Your Honor already remarked, defendants haven't made a showing based on undue burden that they're going to say that something in between 2019 and 2021 is somehow unduly burdensome.

THE COURT:  All right.  So given the allegations that these relationships go back to 2019 and defendants' claim that there wasn't any -- they weren't even in the picture until 2021, I don't know how it would be objectionable to just, you know, produce what you have, and if you have something from 2019, you know, produce it and if it -- if the documents are all 2021 and later, produce those. So I think the timeframe is fine.

With respect to No. 5, though, it -- the other issue that I had with that was that it does appear -- I think MSD made the position that it was vague and overbroad and should be limited as to time.  I think the 2019 is fine, but I also think it needs to be limited to transactions between MSD and the alter-ego companies.  So No. 5 asks for all

documents showing MSD purchasing, selling, or transferring any assets.  That should be limited to the purchase, sale, or transfer of assets with the other defendants, with the alter -- the other -- the alleged alter-ego entities.  Okay?

MR. CARROLL:  Your Honor, may I be heard on that matter briefly?

THE COURT:  Yes.

MR. CARROLL:  So with respect to No. 5, I think -- although I think it is important to show asset transfers between the entities, I think, also, the transfer of assets to entities other than those other defendants is important because I think it relates to capitalization of the company and whether or not the company was properly capitalized or undercapitalized.  So knowing how much assets that they have in total, whether it has anything to do with the other entities, is important as well and relevant.

THE COURT:  All right.  I --

MR. DORENBAUM:  Your Honor, if I may respond to that briefly?

THE COURT:  Yes.

MR. DORENBAUM:  Your Honor, they also request for, you know, the general -- and we've agreed to provide general financial statements --

THE COURT:  Right.

MR. DORENBAUM:  -- for the company.  So they'll

know --

THE COURT:  Uh-huh.

MR. DORENBAUM:  -- what the overall capitalization is of the company at any given time.

THE COURT:  Right.  I think you have those requests -- you know, that you've asked for sort of the financial assets of the company as of the time when they entered into the agreement with plaintiff.  So I don't think that for No. 5 we need to go beyond to assets -- asset transfers to the alter-ego entities.

All right.  The next group of disputes relate to -- I think it's RFPs 10 and 12 -- 10 through 12: Documents relating to accounts of any type that are capable of storing assets that MSD owns, controls, is a trustee or beneficiary of, or has the ability to make deposits to or withdrawals from.  This seems really overbroad, and I'm wondering why we can't just limit it to MSD's bank accounts.

MR. CARROLL:  I think that's primarily what we are concerned with --

THE COURT:  Okay.

MR. CARROLL:  -- with 10 through 12.  Pardon me.  I think we phrased it in this manner in the event that there were repositories of assets that did not constitute a bank account.  You know, sort of not knowing what we don't know, I'm not entirely sure what that might be, but that is why it

was sort of phrased in that manner --

THE COURT:  Yeah.

MR. CARROLL:  -- to get at -- yeah, like, I -- you know, to the extent that they characterize, you know, cryptocurrency accounts, maybe if they have cryptocurrency holdings as not bank accounts, or PayPal accounts as not bank accounts, or things of that nature.

THE COURT:  I still think it's very -- it's overbroad as phrased, and I'm going to limit it to bank accounts.

The next dispute is RFP 48, which asks for: All documents relating to, regarding, or referring to Fox Cable Network Services, Tubi, Fox Corporation, and Fox Media.  That -- and MSD objects that it is overbroad and not proportional to the needs of the case, and I do think there is merit to that.  It is overbroad.  Why can't we just limit it to "documents that refer to Fox and the other entities, Fox Cable, Tubi, Fox Corporation, or Fox Media"?  Then I think that sufficiently narrows it.

MR. CARROLL:  To clarify, Your Honor, so it would be "all documents referring to Fox Cable, Tubi, Fox Corporation, and Fox Media"?

THE COURT:  Right.

MR. CARROLL:  I think we would be agreeable to that.

THE COURT:  Okay.  Then the next one is RFP 52, which is -- it has a host of issues with it -- All documents relating to, regarding, referring to, or evidencing any failure to pay fees to Club Pachuca or Club Leon.  I think what you're getting at is documents reflecting MSD's nonpayment of these fees -- right? -- payment or nonpayment of fees to these sublicensees?  So why not just construe it to be documents reflecting MSD's payment or nonpayment of fees to Club Pachuca or Club Leon?

MR. CARROLL:  I think one concern, Your Honor, we would have with that limitation is to the extent -- I -- you know, I would be concerned that it would be construed only to relate to, say, bank statements showing payments, as opposed to, maybe, discussions about why the payments aren't being made.  And I think the discussions about why payments aren't being made is also relevant to the disputes in this case.  Because our -- you know, I -- the way that the sublicenses in this case came to be is that -- our allegation is that the defendants weren't paying their license fees, and so the original licenses between the clubs and the defendants in this case were essentially terminated.  We stepped in, secured those licenses, and then sublicensed it to the defendants.

So for that reason, I think that, if there are documents discussing, like, you know, the length of time of

the failure to pay fees or the intent not to pay fees in the future -- especially since there's a -- I think a dispute with the defendants about whether or not this is even a valid sublicense to begin with, I think that is relevant to the claims and important to the claims as well since they're saying that because of that that the sublicense is not valid in and of itself.

THE COURT:  Yeah.  The problem is the way it's phrased.  I don't know that that would -- I just think it's --

MR. DORENBAUM:  Your Honor, I'm with you.  If that is the intent of the question, then I agree, but I don't read the request that way.

THE COURT:  Yeah.

MR. DORENBAUM:  I read it as broader.  And so I don't think Mr. Carroll and I have a disagreement here.  I just think we have a disagreement about interpreting his -- this request.

THE COURT:  Right.  I don't interpret it to mean sort of communications with the licensees relating to the payment or nonpayment of fees.  I read it more as you're looking for whether they paid those fees or didn't pay those fees.  I think MSD's objection was that it presupposes that they didn't pay the fees.  They disagree with that.  So I think if we just construe it to be all documents reflecting

MSD's payment or nonpayment of fees to these two clubs, I think that takes care of the overbroad sort of nature of it. And if you want information regarding communications with these entities regarding the payment or nonpayment of fees, then you should draft a discovery request that targets that.

All right. So then there was also RFP 48: All documents relating to, regarding, referring to, or evidencing your loss of rights relating to the production, distribution, exhibition, or broadcast of any sporting events, including the loss of NFL rights, Premiere League rights, and/or C-o-n-c-a-c-a-f rights.

` So, you know, MSD's objection to this is that it is facially overbroad in that it seeks "all documents relating to or referring to" and also that somehow plaintiff isn't entitled to every single document referring to the loss of rights. I don't know. I -- my inclination is that it's relevant because that's really what this case is about, and to the extent that you argue -- defendant argues that it's disproportionate or unduly burdensome, I don't know that you met any -- met that standard.

So I don't know if there is a way to limit this, but I think it is definitely relevant. Is your objection that it's overbroad because of the language "relating to, regarding, referring to, or evidencing loss of rights"? I mean, why can't we just construe it to be "all documents

reflecting," you know, "MSD's loss of rights"?  Would that be sufficiently --

MR. DORENBAUM:  That would be better.  Yes, Your Honor.

THE COURT:  Okay.

MR. DORENBAUM:  I -- my understanding from plaintiffs' claims are that they are really focused on the rights -- the loss -- even the tort claim really focused on the loss of rights relating to the Pachuca and Leon licenses, and so that is why we objected to the inclusion of all the other sporting events -- sporting rights --

THE COURT:  Okay.

MR. DORENBAUM:  -- in this question.

THE COURT:  Okay.

Do you want to respond to that, Mr. Carroll?

MR. CARROLL:  Yes, Your Honor.

So with respect to the breach of the sublicense agreements, those concern Pachuca and Leon, but the tortious interference claim, I think, as Your Honor observed, relates also to the loss more broadly of these rights that were very public and embarrassing for Fox, reduced the value of Fox's -- you know, sort of tarnished Fox's reputation and the value of its marks, and that's how it harmed Tubi.  So I think the documents reflecting loss of those rights are certainly relevant to the case, and I think, as Your Honor pointed out,

there hasn't been a showing of any kind about why this would be unduly burdensome, and I think part of defendants' burden here is to produce declarations or produce -- somehow quantify why this is unduly burdensome to produce, which they haven't done.

THE COURT:  Okay.

MR. DORENBAUM:  And if I may, just to point to the claim.  Paragraph 109 of the Second Amended Complaint, defendant --

THE COURT:  Is that attached as an exhibit, by the way?  Do you know?

MR. DORENBAUM:  Sorry.  I didn't hear Your Honor.

THE COURT:  Is the Second Amended Complaint attached as an exhibit to your --

(Multiple speakers.)

THE COURT:  -- joint stipulation?

MR. DORENBAUM:  Go ahead, Mr. Carroll.

MR. CARROLL:  I don't believe it is, Your Honor.

THE COURT:  Okay.  Yeah.

MR. CARROLL:  Unfortunately, I think it is just on the (audible).

THE COURT:  Yeah.  I don't remember seeing that.

Okay.  Go ahead.  So you were saying paragraph 109?

MR. DORENBAUM:  Yes, Your Honor.  It reads -- line 8 -- On information and belief, defendants knew that Tubi

would be streaming the soccer matches in Mexico once Tubi publicly announced on December 18, 2024 that it would be so.

Tubi -- my understanding is that these advertising relationships that Tubi alleges existed were tarnished, and they're related to the broadcasting of soccer matches.  I'm not aware that Tubi was intending to broadcast any other sporting events or that any other sporting events factored into their discussions with potential advertisers for streaming of soccer events.  And I think the relevant issue here is about the soccer licenses with these clubs and whether -- you know, and that's where the public media attention relating to Tubi's advertising of those streaming events would be relevant.  I'm not sure how streaming events of other sporting events unrelated to what Tubi is even televising is relevant to this case, but.

THE COURT:  Right.  Right.

Yeah, so, Mr. Carroll, why can't we just limit it to the -- relating to the loss of rights that relate to the broadcasting of soccer sporting events?

MR. CARROLL:  So, Your Honor, it's not just the loss of Pachuca and Leon licenses that reduced or tarnished the reputation of the Fox brand and the "Fox Sports" trademarks.  It was a broader loss of multiple rights across a number of different sporting events -- NFL rights -- NFL rights, Concacaf rights -- a number of different loss of

rights, and because these were so widespread and publicly recorded, that's what reduced the value of the Fox reputation and the "Fox Sports" marks.  So when Tubi, then, in turn was looking to broadcast the Pachuca and Leon soccer matches, they were unable to secure greater advertising revenue from their advertisers because they said, "Well, we don't really want to be affiliated with this sort of damaged Fox Sports brand because it's sort of" -- "it's now known with the Mexican sports market as an unreliable brand because they keep losing these rights."  So that's why it's not just limited to Pachuca and Leon or even soccer necessarily.  It's more broadly related to all of the broadcast rights that they had that they've lost.

And all of these are actually alleged in the Complaint.  It's not just alleged to be a loss of the Pachuca and Leon rights.  It is alleged to be a loss more broadly of these rights in the Complaint, and I can point the Court to paragraphs -- for example, paragraph 66, where it discusses the loss of NFL's broadcasting rights, and 67, which refers to the loss of several soccer broadcasting rights, both in Mexico and in the Europe.  World Rally Championship rights, Grand Prix rights -- all of those rights were lost, and I think -- it was the totality of all of the loss of these rights that created the reputational harm at issue.

THE COURT:  Okay.  All right.  We'll leave it as it

is, then, with respect to the loss of the other sporting rights as well, but we'll limit it to reflecting the loss of rights.

Then the next dispute -- with respect to the privilege log, to the extent that MSD withholds production of any documents on the basis of a privilege assertion, they must produce a privilege log which identifies the parties to the communication and indicating whether those are attorneys and sort of describing the nature of that communication with enough specificity to permit plaintiff to challenge the privilege assertion.  Okay?  So a detailed privilege log for any documents that are being withheld.

Let's get to the RFAs.  The -- RFAs 47 to 48 and 62 to 67 seek admissions from MSD that they didn't possess the amount of money that was necessary for them to make the initial payment under the licensing contracts to Fox.  And MSD says that it's not relevant to show that the amount held in their bank accounts as of those dates are relevant and the RFAs have different dates, and they also argue that the dates are not relevant.

But I do think that plaintiffs are entitled to know what MSD had in their bank accounts on these dates.  It doesn't preclude MSD from arguing that -- you know, whether they had or didn't have funds on a particular date is not relevant because those fees were not due until a later point

in time, but I do think it is relevant, even if, you know, later on they'll argue that it doesn't matter what they had in their account in July because a payment wasn't due until August.  They don't give up that argument by admitting what they had in their accounts.  So I think that those RFAs are relevant, and I'm inclined to grant the motion to compel on those.

Do you want to be heard on that, Mr. Dorenbaum?

MR. DORENBAUM:  No, Your Honor.

THE COURT:  Okay.

MR. DORENBAUM:  I think our arguments are set out, and I understand the Court's position.

THE COURT:  Okay.

And then the next dispute relates to the RFAs that -- 57 and 59, which seek admissions about whether payments were made and who directed MSD not to make payments under the sublicensing agreements at issue.  I think MSD's objection to that is that this presupposes that MSD was required to make payments, and they dispute that.  But I think what we can do is we can change it to, you know, admissions that MSD paid Fox the fees under the soccer sublicensees, instead of paid the fees that they were required to pay.  So just admit that they either paid them or didn't pay them.

MR. DORENBAUM:  For the record, Your Honor, that was what we proposed in meet-and-confer.

THE COURT: Okay.

MR. DORENBAUM: And in addition to that, I would just like to note that these are a set of questions -- isolating 57 and 59 and not seeing them in the context of 56 --

THE COURT: Uh-huh.

MR. DORENBAUM: -- and so on and so forth -- these are repetitive questions. And they're RFAs. We're not -- you know, we can answer them in repetition. It's not --

THE COURT: Right.

MR. DORENBAUM: -- you know, it's not going to be unduly burdensome to answer in a packet of RFAs.

THE COURT: Okay.

MR. DORENBAUM: But I do think that we provided responses to the substantive questions that plaintiffs seek in these RFAs.

THE COURT: Okay.

MR. DORENBAUM: But we will amend, you know, subject to the Court's instruction on how to ask the question.

THE COURT: Okay.

And then the next dispute -- there's RFAs that seek admission that copies of the sublicensing agreements are genuine and authentic, and MSD basically said, "Yeah, these are genuine, but they have highlights on them, which the

original didn't."  But I think the -- I think what plaintiffs are getting at is -- aside from the highlight is are you saying that the language that was highlighted was not part of the original or that you're just saying it is a true and correct, authentic copy of the original except that this copy has a highlight which the original doesn't?  Like, I think that's where the sort of dispute is.

So I think MSD just needs to amend its response to state that the copies are true and correct copies other than there is a highlight on the original which is not on the -- sorry -- a highlight on the copy which is not on the original.  Because it's not clear whether -- when you use the language "appear to be," it's not clear whether you're saying that the copy is a correct copy of the original but with the addition of the highlight.  So just make that clear.

MR. DORENBAUM:  Okay.

THE COURT:  And then the last issue is the timing of further responses.  And I understand MSD is saying, "Look. Discovery doesn't close for another year.  There's no rush on this," but I have seen far too many discovery disputes that come before the Court too late for the parties to comply with their fact discovery deadlines, and so, you know, I think that, if the discovery requests have been served and there's no sort of problem with gathering the records and that it's not a logistical problem with production, then production

should be -- should not be sort of put off just because, you know, the deadline hasn't -- is a ways away.

So, Mr. Dorenbaum, are you in a position to sort of provide the Court with an estimate of how long it would take you to respond to the disputed requests and submit the amended responses?

MR. DORENBAUM:  Your Honor, we did submit amended responses after the supplemental -- after plaintiffs provided -- submitted the supplemental brief to responses that we agreed to supplement.

In terms of a production, I'm not in a position to specify dates on when we can have a completed production.  I do believe that we need to -- the main issue there is the protective order, from our perspective.  I emailed a proposed protective order with redlines to plaintiffs' redlines -- we had been going back and forth over the summer, and my latest draft to plaintiffs went unanswered.  So we are still seeking to finalize the protective order.

Our concern there, Your Honor, is that there are multiple cases going on between these entities, both in the United States and in Mexico, and our concern is that discovery is going to be used really to litigate not this case but other cases, and so we are -- you know, and we have had evidence of Fox using documents in one matter or using documents, for example, in the merger acquisition that were

intended to be confidential but later using them and citing to them in their Second Amended Complaint and using them in filings in this case. And so we believe it's necessary to have the protective order in place to adequately protect the confidentiality of some of these records, and so that's number one step before we can actually --

THE COURT: Okay.

MR. DORENBAUM: -- you know, determine a full schedule.

But that said, Your Honor, I do want to emphasize we appreciate that, you know -- we -- production needs to occur. We're -- you know, do not intend to sit on our hands here and delay. We have made a production. We have responded to Fox's meet-and-confers and have engaged -- have made concessions and updated our responses so we --

THE COURT: Okay. So --

MR. DORENBAUM: -- we intend to work with them.

THE COURT: With respect to the protective order, you should get that to the Court as soon as possible, and if you're not able to agree to certain provisions of it, you can seek an informal discovery conference with the Court on that issue submitting your own proposed versions of the language that you disagree on and then just a brief argument as to why you're seeking that language, and we can set that at a -- for an informal discovery conference in accordance with my

procedures for that and get that resolved because it sounds like that's going to be necessary before any production is.

So why don't I order that defendants' production should begin within 60 days, and just so that it doesn't drag on maybe complete it within 120 days?  All right?

MR. CARROLL:  Your Honor, may I just make one remark with respect to the protective order?

THE COURT:  Yeah.

MR. CARROLL:  The parties are very close on a form of the protective order, and we had -- I believe back in July we had -- there were two points of dispute, and Fox said, you know, "While we're still considering these points, we will agree to abide by the version that you want so that we can just get the production started," and that was the basis of the July production.  So I don't think it's correct to say that the protective order is what's holding up production here, and so, you know, I did just sort of want to put that on the record.

You know, we -- I think maybe if we could ask for a production within -- or a completion of production within 90 days, as opposed to 120 days, and then, if for some reason that proves impossible to do, I think parties can come back to the Court and explain their positions if there's not agreement on pushing that date out.  But we would, if possible, like to complete it within 90 days so any follow-up

discovery that needs to be done or insufficient productions, depositions, and the like, can happen earlier in the case and get resolved.  You know, we just don't want -- we just want to make sure that sort of all discovery isn't sort of all then pushed sort of unnecessarily down the road.

THE COURT:  Okay.

That make sense?  Mr. Dorenbaum, do you want to be heard on that?

MR. DORENBAUM:  I mean, obviously I'd prefer 120 days.

THE COURT:  Yeah.

MR. DORENBAUM:  That gives my client sufficient time to -- and I think that that's fine within the trial schedule.  I don't think there's a need to unnecessarily push deadlines shorter, especially when we'll begin -- you know, we have the start date for producing documents.

THE COURT:  Right.

MR. DORENBAUM:  So I'd actually be inclined to --

THE COURT:  Well, the reason I was going with the 120 was because I was thinking that you would need some time to finalize a protective order, but if that's pretty much a done deal, then I think 90 days should be fine, and then of course --

MR. DORENBAUM:  Well --

THE COURT:  -- if you need additional time, you can

always --

MR. DORENBAUM:  Sure.  That's fine, Your Honor.

THE COURT:  Yeah.  Yeah.

MR. DORENBAUM:  I -- you know, I just didn't -- I didn't know what Fox's position was vis-à-vis the last revisions of the protective order.

THE COURT:  Right.

MR. DORENBAUM:  But it's heartening to know that we're close.

THE COURT:  Okay.

MR. DORENBAUM:  And with respect to -- I just want to address the issue that Mr. Carroll brought up about -- just for the record -- about the informal agreement to produce documents.  That is true.  We had an agreement to produce documents subject to the terms of the -- the latest version of the protective order.  However, since that agreement came up, Fox has initiated further litigation against MSD in other jurisdictions relating to the very same issues here, and for that reason, we feel it's absolutely necessary to finalize -- in addition to all our other concerns about confidentiality to finalize this protective order before we start handing over more confidential materials.

THE COURT:  Right.  Well, it sounds like they're on board with your version of it.  So you should be able to get

that filed promptly and then begin the discovery production. Okay?  And I will issue an order setting forth today's rulings.

MR. DORENBAUM:  Thank you, Your Honor.

THE COURT:  All right?

MR. CARROLL:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  Anything further that we need to take up?

MR. CARROLL:  Nothing further from the plaintiffs, Your Honor.

THE COURT:  All right.  Thank you.  Everybody have a good rest of the day.

MR. DORENBAUM:  Thank you.

(Proceedings adjourned at 10:50 a.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa            November 14, 2025
Julie Messa, CET**D-403     Date
Transcriber